Wooley v. Campbell.

| 37 | 163 |
| 46e | 372 |
| 37 | 163 |
| 55 | 265 |
| 37 | 163 |
| 60 | 166 |

## WOOLEY v. CAMPBELL ET AL.

1. The right of fishing and taking oysters in the tidal waters of this state, is *prima facie* common to all the people of this state. But the legislature may grant a right of enjoyment in lands under tide waters to private individuals for the purpose of fishing and planting oysters, to the exclusion of the public right therein.

2. Several lessees, under the act entitled " An act to authorize the planting of oysters on lands covered with water in Shark river, and for the protection of the same," (*Acts*, 1861, *p.* 436,) may, by agreement, use

Wooley v. Campbell.

jointly the lands which have been granted to them severally, for the purpose of planting oysters; and in such case having a joint property in the oysters planted, may join in an action to recover damages for taking their joint property.

3. The doctrine that one mixing his goods with those of another, so that a separation is impossible, loses his property, is a doctrine that is adopted to prevent fraud, and is not applied, except in favor of an innocent party against a wrong doer. A person who is himself a wrong doer, is not entitled to the benefit of this principle.

On *certiorari* to Monmouth Pleas.

Argued at February Term, 1874, before Justices Bedle, Dalrimple and Depue.

For the plaintiff in *certiorari*, G. C. Beekman.

Contra, W. H. Vredenburgh.

The opinion of the court was delivered by

Depue, J.   The plaintiffs below sued the defendant before a justice of the peace in an action of trespass, for taking oysters from lands in Shark river.   A judgment having been given for the plaintiffs, an appeal was taken to Monmouth Pleas, where the result was also in favor of the plaintiffs. The *certiorari* removes the judgment and proceedings of the latter court into this court for review.

The plaintiffs based their right to the exclusive possession and use of the place from which the oysters were taken, on two leases made by commissioners appointed by the board of chosen freeholders of the county of Monmouth, under an act of the legislature entitled "An act to authorize the planting of oysters on lands covered with water in Shark river, in the county of Monmouth, and for the protection of the same," approved March 14th, 1861.   (*Acts*, 1861, *p*. 436.)

The grounds from which the oysters were taken, were in the bed of Shark river, in which the tide ebbs and flows, and were below low water mark, and were natural oyster grounds. After the lessees obtained their leases, they planted oysters

on the *locus in quo.* At the time they planted their oysters, a few scattered natural oysters were on the grounds, and there was no evidence that the oysters taken by the defendant, were the identical oysters planted by the plaintiffs, and were not the natural oysters found on the grounds, or their increase.

Navigable rivers, where the tide ebbs and flows, including both the waters and the land under the waters, for the purpose of navigation, fishing and all other uses of the water and its products, are common to all the people of New Jersey. *Arnold* v. *Mundy,* 1 *Halst.* 1.

It is insisted, as the first reason for reversal, that this public right of fishing in tidal waters, is incapable of being abridged or taken away by the legislature.

By the common law, the public and common right of fishing (which includes the taking of oysters) in tidal waters, is only a *prima facie* right, which may be abridged by proof of the existence of an exclusive privilege in an individual by grant or prescription. But for Magna Charta, the crown, by its prerogative, could exclude the public from such *prima facie* right, and grant an exclusive enjoyment to a private individual, either together with, or distinct from, the soil. *Hale de Jure Maris, ch.* 5 ; *Lord Fitz Walter's Case,* 1 *Mod.* 105 ; *Carter* v. *Murcot,* 4 *Burr.* 2162 ; *Malcomson* v. *O'Dea,* 10 *H. of L. Cases* 593.

In consequence of the restrictions on the royal prerogative by the Great Charter of John, and its confirmation by his successor, Henry III, a grant from the crown of an exclusive right of fishing in public waters, must be shown to have been made as early at least as the reign of Henry II. 2 *Bl. Com.* 39 ; 2 *Steph. Com.* 22 ; *Malcomson* v. *O'Dea,* cited above.

This restriction on the royal prerogative was intended to curb the sovereign power of the king, and prevent the interference with these public rights at his pleasure. But it could not operate to abridge the power of Parliament over public and common rights. Of necessity, the jurisdiction to regulate and dispose of those rights which are public and common, must reside in the legislative body, which is the representa-

tive of the people. No instance, perhaps, can be found, of a grant by Parliament of an exclusive right of fishery. But the numerous cases in which the soil of public and navigable waters has been appropriated to private uses, to the destruction of the public rights of fishery and navigation, in the construction of railroads, wharves, docks, and other improvements, completely vindicates the power of Parliament in the premises. *The King* v. *Montague*, 4 *B. & C.* 598 ; *Com.* v. *Alger*, 7 *Cush.* 82 ; *Chalker* v. *Dickinson*, 1 *Conn.* 382.

In Arnold *v.* Mundy, Chief Justice Kirkpatrick, speaking of the legislative authority over the common rights of citizens in navigable waters, denies the power of the legislature to make a direct and absolute grant of the waters of the state, which shall divest the citizens of their common right. But he admits that the legislature, as the rightful representative of the public, may make such regulations concerning them, for improving and securing the common benefit as it may judge expedient; among which, he classifies the improvement of fishing places, to increase the product of the fisheries, and the creation and enlargement of oyster beds, by planting oysters therein, in order to procure a more ample supply ; and he affirms that the legislature may do these things at the public expense, or may authorize others to do them by their own labor and at their own expense, " giving them reasonable tolls, rents, profits, or exclusive and temporary enjoyments."

These views of the Chief Justice, which were merely *obiter dicta*, are commented on by Mr. Justice Randolph in *Gough* v. *Bell*, as reported in 1 *Zab.* 165, and by Chief Justice Green, in the same case, in 2 *Zab.* 459. Both those eminent jurists declare that the view of the Chief Justice, in Arnold *v.* Mundy, of the power of the legislature, is too restrictive. Chief Justice Green says that, " if it be intended to deny the power of the legislature by grant to limit common rights, or to appropriate lands covered by water to individual enjoyment, to the exclusion of the public common rights of navigation or fishery, the position is too broadly stated." And among the illustrations given by both Mr. Justice Randolph

and Chief Justice Green, as incontestably within legislative competency, is the leasing, or appropriating to private uses, of lands under water for the purpose of planting oysters.

In *Townsend* v. *Brown*, 4 *Zab.* 80, this court gave construction to the act for the preservation of clams and oysters, (*Nix. Dig.* 132,) which empowered riparian owners to stake off the flats along the shores of tide waters for exclusive use, for planting clams, oysters, and other shell fish, without the expression of any doubt of the constitutionality of the law. And in Bennet *v.* Boggs, Mr. Justice Baldwin held that neither the state nor federal constitutions secured the common right of fishery to the people of the state. *Bald. C. C. R.* 60.

In *Martin et al.* v. *Waddell*, 16 *Peters* 367, the title of the defendant which prevailed, was under acts of the legislature authorizing the appropriation of lands under tide waters to an exclusive private use, for the purpose of planting oysters, very like the provisions of the act now in question. (*Acts*, 1824, *pp.* 28, 94.) The controversy, in that case, was between persons each claiming an exclusive possession of the premises, the one under a grant from the proprietors; the other, from the state; and was not between the claimant of an exclusive right, under legislative grant, and a person claiming under the common right of citizens in navigable waters. The decision might have been in favor of the defendant, because of the weakness of the plaintiff's title. But the power of the legislature to make an exclusive grant of lands under water for such purposes, in case the state was the owner, seems to have been assumed by Taney, C. J., in the opinion of the court. In the dissenting opinion of Mr. Justice Thompson, the legislative power is conceded, if the title of the state is proprietary. His dissent was based on the ground that, in his view, the title of the state to lands under tide waters was merely as trustee, in the place of the king, to hold for the common benefit, and that, therefore, such lands could not be converted by the legislature to the private use of individuals, to the exclusion of the common right of the public, without a breach of trust. That question was adjudi-

cated in Arnold *v.* Mundy, and was finally set at rest by the decision of the Court of Errors in *Stevens* v. *The Paterson and Newark R. R. Co.,* 5 *Vroom* 532. In the latter case, the court decided that the title of the state is proprietary, an attribute of which is the unqualified right of disposition to public or private uses, either absolutely, or for a qualified estate, as in legislative discretion may be deemed most conducive to the public interest.

It may be observed, that the act under which the plaintiffs claim exclusive possession, limits the quantity of land to be leased to one person to two acres, and to a company, to five acres ; and provides that the term shall not exceed five years. In this aspect, the act might be regarded as merely a reasonable regulation of the public rights for a temporary purpose, to increase the product of the oyster beds in the river. But whether the statute be regarded as a temporary regulation, or be construed as giving a power of indefinite duration, in permitting a re-letting, after the expiration of the first lease, is, in my judgment, immaterial. The legislative power to alien these lands, necessarily includes the power to let or dispose of them for a longer or shorter period, and for such purposes and on such terms as may be prescribed.

The next reason for reversal which will be considered is, that the leases, on which the plaintiffs base their right of possession, being for four acres, are in excess of the limitation of the act, and are void, and that judgment should have been for the treble damages given by the act.

The facts to sustain the first branch of this objection did not appear on the record. The leases have not been laid before the court. As every intendment will be made in favor of the legality of the proceedings below, it will be assumed that two separate leases were made to the plaintiffs individually, each for a quantity of land not in excess of the statutory limitation. If the plaintiffs severally held leases for two acres each, they might arrange between themselves to use jointly what had been granted to them severally. In such case, having a joint property in the oysters planted, they

might, and should, join in an action to recover damages for the taking of their joint property.

The plaintiffs had an election to bring an action upon the statute, or to sue in a common law action for the trespass. They elected to pursue the latter remedy. The reference to the act in the pleadings, and the object of putting the leases in evidence was, to exclude the conclusion that, by depositing their oysters on a natural oyster bed in tidal waters, they abandoned their property in them, which, under the decision of this court, in *Shephard* v. *Leverson*, 1 *Penn.* 391, would bar any action for damages for taking them. Having waived their action under the statute by bringing a common law action, their damages were properly assessed on the basis of the actual damage sustained, without the increase to the treble damages given by the statute.

The third and last reason relied on is, that the plaintiffs mixed their oysters with the natural oysters in the bed, and that it was impossible to distinguish them from the natural oysters, or, at least, that there was no evidence that the oysters taken were exclusively those planted by the plaintiffs.

The doctrine that one, mixing his goods with another owner, so that a separation is impossible, loses his property, is a doctrine that is adopted to prevent fraud. It is never resorted to, except in favor of an innocent party as against a wrong-doer. *Ward* v. *Ayre, Cro. Jac.* 366 ; 2 *Bl. Com.* 405 ; 2 *Kent* 365 ; *Ryder* v. *Hathaway*, 21 *Pick.* 298 ; *Buckley* v. *Gross*, 3 *B. & S.* 566. The defendant was himself a wrong-doer, in entering on the premises in which the plaintiffs had a leasehold interest, and is not entitled to the protection of this principle.

There is no error in the proceedings below, and the judgment should be affirmed.

Justices BEDLE and DALRIMPLE concurred.