CHARLES W. MULLEN *vs.* PENOBSCOT LOG-DRIVING COMPANY.

Penobscot.    Opinion September 20, 1897.

*Log-Driving Company.    Corporation.    Waters.    Dams.    Constitutional Law. Spec. Laws, c. 407, 1846; 86, 1847; 243, 1849; 379, 1864; 59, 1869; 214, 1876; 262, 1883.*

By the act incorporating the Penobscot Log-Driving Company, passed in 1847, the Legislature in terms authorized and in effect required the company to "drive all logs and other timber that may be in the West Branch of Penobscot River between Chesuncook Dam and the East Branch to any place at or above the Penobscot boom where logs are usually rafted." At that date the only rafting place was, and ever since has been, at the Penobscot boom, and no one then expected there ever would be any other. To enable the company to successfully perform the imperative and responsible duties imposed on it, the legislature granted to it the superior and controlling use of the waters of the West Branch for its purposes. To that end it was authorized to clear the river of any obstructions to log-driving; to maintain dams and booms and other necessary erections; to create flowage upon lands of private owners, and pay for any injury caused thereby, under the exercise of the power of eminent domain; and to adopt modes and methods generally by which it could collect together great masses of water, and control and utilize them for driving all the logs in that branch of the river together.

An unbroken practice of this kind continued until 1895, when the plaintiff had a quantity of pulp-logs in the West Branch, below Chesuncook Dam and above the East Branch, which he intended to have driven down to Montague, not a place where logs are usually rafted, situated some distance on the main river above the Penobscot boom. He claimed that he was entitled to a head of water through the gates of Chesuncook Dam to drive his logs in advance of the company's general drive, while the company claimed that it had the right to drive his logs with its own.

*Held;* That the company was not obliged to drive the plaintiff's logs; nor had it the right to drive them without the owner's consent, inasmuch as Montague was not at the time a usual rafting place for logs.

*Held, also;* That the plaintiff was not entitled to any portion of the stores or reserves of water at the time already accumulated within the dams of the defendant company, and that the company could not be required to release any portion of the same through its gates or works for the benefit of the plaintiff.

*Held, further;* That the plaintiff was not entitled to draw through the company's dam what would be the natural run of the river, so long as the company was retaining it for the acquisition of stores of water, provided it

needed the same or would be likely to need the same for driving its own logs.

It is too late in the history of the question in this State to contend that the State has not the constitutional power to grant superior, or even exclusive privileges, in the use of its public rivers either to persons or corporations.

ON REPORT.

This was an action on the case in which the plaintiff claimed damages from the defendant corporation, chartered by the State of Maine to improve the navigation of Penobscot river, and its tributaries, to facilitate the driving of logs. The plaintiff claimed that he was injured by withholding of the water needed to drive his logs; that he was entitled by law to enough of the water stored by the dams of the defendant corporation to drive his logs. He also claimed that he was entitled to the use of the natural flow of the river; and, in an additional count, charged the defendant corporation with depriving him of water for his drive in a needless and unreasonable manner.

The defendant by its pleadings claimed that, under the provisions of its charter, it was alone entitled to drive the logs in question; that the plaintiff had no right to drive his logs at this place, although admitting that Montague, the destination of the plaintiff's logs and which place of destination was made known to the defendant, was not a place where logs were usually rafted within the meaning of the provisions of its charter; and also admitting that such of the plaintiff's logs as it took into its drive it did not deliver at said Montague.

The defendant further claimed that it was entitled to the natural flow of the river, for driving purposes to the exclusion of the plaintiff; and that it was entitled to the use of all the water in the river stored by its dams for driving purposes to the exclusion of the plaintiff.

Upon the reading of the writ, and the pleadings in the case, and after admissions by the defendant that Montague, the place of destination of plaintiff's logs, while above the Penobscot boom, was not a place where logs were usually rafted within the meaning of the provisions of defendant's charter, and that such of plaintiff's logs as were in its drive it did not deliver at Montague, though

plaintiff himself there stopped such of his logs as he could, the justice presiding reported the case to the full court to see if the action was maintainable, and upon what grounds maintainable, before an expensive trial upon the facts. The case was then submitted to the full court upon the following propositions: If the action can be maintained by proof upon the count in the writ alleging damages for being deprived of the natural run of water in the river, or if maintainable upon the count in the writ which declares for damages sustained by the plaintiff by the defendant's refusal to allow them the use of the waters kept in reserve by the defendant's dams, then the action was to stand for trial. Or, if the court should be of opinion that the action may be maintained under the other count of the writ declaring for damages in general terms, but covering, perhaps, no more than the causes alleged in the other two counts, then the action was to stand for trial. And if, in the opinion of the court, the action was not maintainable upon either of the counts in the writ, then the plaintiff to be nonsuit.

· All the public and private and special acts of the legislature touching the subject to be regarded as facts proved in the case.

The facts are stated in the opinion.

*C. F. Woodard*, for plaintiff.

Independently of legislation the plaintiff at common law had the right to drive his logs, and was entitled to the reasonable use of the natural run of the water for the purpose of driving his logs. *Moor* v. *Veazie*, 32 Maine, 343, 356; *Pearson* v. *Rolfe*, 76 Maine, 380, 384–388. The defendant, by the provisions of its charter, was not given the exclusive right of navigation.

Rules of construction of legislative acts: *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 666; *Davis* v. *Log Driving Co.*, 82 Maine, 346, 350; *Improvement Co.* v. *Brown*, 77 Maine, 40, 41.

The provisions of defendant's charter do not cover such a case as this. The language "to any place at or above the Penobscot boom, where logs are usually rafted" was not inserted without a purpose. Hence the legislature said, not all the logs and other timber that might be in the West Branch of the Penobscot river, but only all the logs and other timber that might be in the West

Branch of the Penobscot river destined for Penobscot boom, or some other place where logs are usually rafted.

It would require the clearest and most unequivocal language, on the part of the legislature, to show that it intended to deprive the public of the use of the public highway such as is the West Branch of the Penobscot river for the purpose of driving logs and lumber, that being practically the only use of which said public highway ever has been or is capable, especially in view of the rule of construction already stated.

That the legislature had no such intention, and did not suppose that no one, other than the defendant, had the right to drive logs and lumber in the West Branch of the Penobscot river, is shown by other action of the legislature not far removed in point of time. Act approved June 22, 1847, (North Twin Dam Company,) and Act approved August 2, 1847, and by which that dam was made free to the public generally without the payment of tolls. Defendant's exclusive claim, under its charter, is incompatible with the act relating to the North Twin Dam. *McPhetres* v. *Moose River Log Driving Company*, 78 Maine, 329, 335.

*Weymouth* v. *Penobscot Log Driving Co.*, 71 Maine, 29, was a case that involved the duty of the defendant to drive all logs and timber, and not its right to the exclusive navigation of the river as against other parties. That case did not undertake to declare that the legislature had the power to confer upon the defendant the exclusive right to navigate a public highway, as against other parties seeking to exercise the right of navigation, in such public highway.

The exclusion of the plaintiff from the right to drive his logs in the West Branch of Penobscot river, a public highway, was beyond the power of the legislature. *Moor* v. *Veazie*, 32 Maine, 343, 356.

The claim that the legislature had the power to exclude the public from this common right of navigation cannot be justified on the ground that the right to have logs driven by the defendant company was substituted for it. If the defendant company should drive any logs it would have to be paid for so doing. The legisla-

ture cannot deprive one of the right to drive his own logs with his own labor, and compel him to employ and pay some one else to drive his logs. This would be to deprive one without compensation of the inherent right to labor on his own property. To compel one to hire and pay another for doing what he might do himself, and to take from him the right to do it himself, furnishes no equivalent or compensation for the right taken away.

All the cases show that the owners of such dams are bound to furnish to the public, to any one having occasion to use them, the reasonable use of all the facilities furnished by such dams upon the terms prescribed by the legislature. All the acts show that they were to facilitate the transportation of logs and lumber generally down the rivers, and without any limitation as to the parties by whom the transportation should be conducted. *Improvement Company* v. *Brown*, 77 Maine, 40, 42; *Lewiston Steam Mill Co.* v. *Richardson Lake Dam Co.*, 77 Maine, 337, 339. Under the doctrine in the last named case, the public generally became entitled to the use of the dam upon the payment of tolls, and everybody having occasion to use the facilities of the dam were entitled to its reasonable use upon the payment of tolls. The water stored by it had been for the use of the public before, upon payment of tolls. After it was paid for, the public had the same right to use it, and without toll. After the defendant became voluntarily the owner of said dam, the plantiff had the right to a reasonable use of all its facilities, that is, to the water accumulated by said dam, the stored water held back by it, for driving purposes.

*F. H. Appleton and H. R. Chaplin*, for defendant.

First. The state may authorize a corporation to stop the natural flow of a river and to erect dams on the river and store water therein. Second. It may give a corporation the exclusive right to navigate a river. *Wilson* v. *The Black Bird Creek Marsh Co.*, 2 Peters, 251, approved in *State* v. *Leighton*, 83 Maine, 419; *Bailey* v. *P. W. & B. R. R. Co.*, 4 Harrington, 389, (44 Am. Dec. 593); *Treat* v. *Lord*, 42 Maine, 560; Wood on Nuisances, § 472.

A public way on land or water may be discontinued by authority of the legislature. *Conn. River Lumber Co.* v. *Alcott Falls Co.*, 65 N. H., 290; *Spring* v. *Russell*, 7 Maine, 273; *Lee* v. *Pembroke Iron Co.*, 57 Maine, 481; *Treat* v. *Lord*, supra; *Pound* v. *Turck*, 95 U. S. 459. In *Treat* v. *Lord*, supra, the court says: "The right to control, abridge, or even destroy the public easement in a stream for the passage of logs, exists in the state by virtue of its sovereignty or right of eminent domain." When the right to use a highway is taken away from the public generally, it may be done without compensation. *Lee* v. *Pembroke Iron Co.*, supra. The state also has the right to give to any one person, or corporation, the exclusive right of navigation. *Moor* v. *Veazie*, 31 Maine, 360; Idem, 32 Maine, 343, and approved by the U. S. Supreme Court in 14 How. 568.

The practical operation of North Twin Dam is as follows: Water is stored during the spring freshet in the dam at Chesuncook and to some extent at North Twin. The logs to be driven from the headwaters of the West Branch are all gathered in Chesuncook Lake; then the gates at Chesuncook are hoisted, the logs are run out and the water, which at that time flows from the Chesuncook Dam with the logs, runs down the West Branch and is used to fill North Twin Dam. The filling of the North Twin Dam causes the water stored there, when the dam is full, to flow back some ten or twelve miles. When the logs that are run out of Chesuncook reach the water which flows back from North Twin, then the dam at Chesuncook is closed, and the logs are driven upon the North-Twin-stored-water into North Twin Dam. When the logs reach North Twin Dam, that dam is supposed to be full, and Chesuncook Dam is full less what was used to run the logs down into North Twin Dam, plus what water has run into the Chesuncook Dam since it was shut down; then the gates at North Twin are hoisted, the drive run out of North Twin, and by a judicious use of the stored water in the two dams, the logs are run into the boom.

By this means a two year's drive is converted into a one year's drive. Without the dam at North Twin, and its use as above stated such a thing would be impossible.

Pulp-logs and pulp-mills were not known at the time of granting the defendant's charter. If the condition of things has changed since the charter was granted, no rights which the company had can be taken away from the company by the change, and if the company to-day has rights which it ought not to have, or if individual owners of logs have not the rights which they ought to have, the remedy is the legislature. The plaintiff could sort his logs at his own expense at Montague if he saw fit, and if any legal doubts exists as to his right to do this, he must seek redress from the legislature. Exactly the same condition of affairs exists on the Kennebec river, which fact is a complete answer to the criticism of the plaintiff.

If the plaintiff could claim the natural flow of the West Branch at any time he wanted it, any other person who wanted to drive his own logs on the West Branch could claim the natural flow of the West Branch at such time as he might want it; and a sufficient number of persons having such right to the natural flow of the river could prevent the storing of any water in such dam, thus rendering the dam of absolutely no value whatever.

The right to maintain a dam, necessarily carries with it the right to store water therein and such stored water, in a dam built under legislative authority for driving purposes, belongs to the owners thereof, just as the stored water in a mill dam belongs to the owners thereof, as was held by this court in *Pearson* v. *Rolfe*, 76 Maine, 386, for both structures are alike legalized and protected by the statutes of the state.

If the contention is sound, that under the act of 1847, the stored water in the North Twin and Chesuncook dams is free to the public in a reasonable manner, then it is free not only to the log driver, but to every mill owner and manufacturer on the river, and the exclusive use of the water for driving purposes vested under the act of 1846 in the defendant company is taken away, and the power to accomplish the purposes for which it was incorporated is taken away at the same time, and thus the defendant's charter is to that extent annulled.

The doctrine of a reasonable use in the public, can never obtain

where there is an exclusive use of the same thing already vested in some person or corporation. With the obligation to drive all logs within its limits, it follows that the exclusive right to use all water within its limits for driving purposes belongs to the defendant.

The plaintiff's construction makes the logs driven by the company bear all the expense of maintaining the driving apparatus on the West Branch; thereby holding out an inducement for every log owner not to put his logs into the West Branch drive—thus practically, tending to put the driving back where it was before the Penobscot Log-Driving Company was chartered.

SITTING: PETERS, C. J., EMERY, FOSTER, HASKELL, STROUT, SAVAGE, JJ.

PETERS, C. J. The plaintiff had certain pulp-logs that had been driven out of a stream tributary to the West Branch of the Penobscot River, at a place below the Chesuncook dam, a structure maintained by the defendant corporation on the West Branch for the purpose of creating a head of water for driving logs; and, designing to have his logs driven down the West Branch as far as Montague, where there was a mill for manufacturing such logs into pulp, he desired to drive them along in advance of the main body of logs to come down the West Branch, knowing that, if his logs became mixed with those logs, many of them would necessarily be carried into Penobscot boom, some miles below Montague, there being no booms and gap for the separation and sorting of logs at the latter place,—the Penobscot boom being the place of destination of logs generally coming down all the branches of Penobscot river. Having a scarcity of water for driving his logs in the manner and at the time desired by him, the plaintiff claims that he was by law entitled to water enough from the stores reserved within the corporation dam for effectuating his purpose. And that is the principal question presented here.

It cannot reasonably be questioned that the legislature intended to impose important responsibilities on the company and to grant to it powers and privileges commensurate with the responsibilities

and duties to be by it assumed; and that, to enable it to perform the duties of its trust effectually, it conferred upon the company, if not an exclusive, certainly a superior and prior right to the use of all the head of water available on the river for the purpose of driving logs. The company has no stock and can declare no dividends. It represents the public and not individuals.

There was great reason for such legislation. Experience had demonstrated that a combined drive of all the logs in that branch of the river and its tributaries could be successfully made by a use of all its waters combined, when separate drives by a separation and division of the same water would as a rule result in failure. It was apparent that logs could be driven more cheaply and expeditiously together. Further, individual owners could not afford to improve the navigation of the river while the company could. Under the old experience some owners would get their logs to the exclusion of others, and thereby useless competitions and strifes were engendered. Under the new experience all owners get their logs alike. And the new system has stood the test of time, for just half a century, successfully and well.

A glance at some portions of the acts affecting the company will illustrate the legislative intent in relation to the exclusiveness of both the duties and powers belonging to the company. All of such acts are enumerated in the special plea or brief statement filed by the defense, there being fourteen of them in all.

Section one of its charter, approved August 10, 1846, describes what its active duties shall be: "Said company may drive all logs and other timber that may be in the West Branch of Penobscot river *between the Chesuncook Dam* and the East Branch, to any place at or above the Penobscot boom, where logs are usually rafted, at as early a period as practicable. And said company may for the purpose aforesaid, clear out and improve the navigation of the river between the points aforesaid, remove obstructions, break jams and erect booms where the same may be lawfully done, and shall have all the powers and privileges and be subject to all the liabilities incident to corporations of a similar nature."

Section three of the charter informs the owners of logs of their

MULLEN v. LOG DRIVING CO.    ، [90

duties as follows: "Every owner of logs or other timber which may be in said West Branch, between said Chesuncook dam and said East Branch, or which may come therein during the season of driving and intended to be driven down said West Branch, shall on or before the fifteenth day of May, in that year, file with the clerk a statement in writing, signed by such owner or owners, his or their authorized agent, of all such logs or timber, the number of feet board-measure of all such logs or timber, and the marks thereon; and the directors or one of them shall require such owner, or owners, or agents, presenting such statement to make oath that the same is, in his or their judgment and belief, true, which oath the directors or either of them are hereby empowered to administer. And if any owner shall neglect or refuse to file a statement, in the manner herein prescribed, the directors may assess such delinquent or delinquents, for his or their proportion of such expenses, such sum or sums as may be by the directors considered just and equitable."

, By a special act, approved July, 1849, the jurisdiction of the company was extended to the head of Chesuncook lake instead of at the foot of the lake as before, and certain additional duties were imposed on the company by the act, which are as follows: "Section 1. The Penobscot Log Driving Company may drive all logs and lumber between the head of Chesuncook lake and the East Branch, instead of between the Chesuncook dam and the East Branch, and with all the powers, rights and privileges, and under the same conditions, limitations and restrictions, as is provided in the act, to which this is additional; and may assess according to the provisions of said act, a sum not exceeding twenty-five cents for each thousand feet, board measure, in addition to the sum of sixty-two and one-half cents, as provided for in the fourth section of said act, for the purpose of paying the expenses of driving said logs and lumber across said lake.

"Section 2. The said Corporation may, and it shall be their duty to build all the boom or booms which may be necessary above the lake, but not to impede the navigation of the same."

By an act, approved March 2, 1864, the duties of the company

are defined and limited in a certain respect, as follows: "Section 1. Said Company shall adopt as the basis of their assessments the boom scale of the Penobscot Boom, or what shall be equal to that scale, to be determined in all cases of doubt by the Directors.

"Sec. 2. Said Company shall be under no obligation to drive any logs coming into the Chesuncook lake at any other point than from the main West Branch, unless seasonably delivered to them at the head or outlet of said lake."

Again, by an act approved February 11, 1869, the powers of the company are enlarged, as follows: "Section 2. Said Company may make contracts for driving or assist in driving logs outside of the limits of the Company, on the Penobscot waters; and for any sum due for such driving, the same lien shall exist and be enforced in the same manner as is provided for other logs.

"Sec. 3. Said Company may build or assist in building, and keep in repair any steamboat or other craft, that in their opinion or in the opinion of the Directors may be advantageous in facilitating the progress of the drive, the expense of which may be apportioned upon the logs of different years as they may think proper."

Still again, by act approved January 28, 1876, the duties of the company were in part defined, as follows: "Section 2. Said Company shall be under no obligation to drive any logs coming into the Chesuncook lake at any other point than from the main West Branch or the Caucomgomoc stream, unless seasonably delivered to it at the head or outlet of said lake, or at the mouth of said stream."

By an act approved February 24, 1883, in order that the company might increase its supplies of water, and for other purposes, it was further provided, as follows: "Sec. 1. The Penobscot Log-Driving Company may build and maintain a dam across the outlet of each of the lakes Caucomgomoc, in the County of Piscataquis, and Millinocket, in the County of Penobscot, to raise a head of water on each of said lakes for log driving purposes only. Said corporation may take land on which to build each of said dams, and may flow contiguous lands. For land taken, and

for land flowed, the parties may agree upon the damages, but if the damages are not mutually adjusted, the owner, or party injured, may be compensated in full by the payment of such sums as may be determined by the commissioners to be appointed by the supreme judicial court in and for the county where the land is situate, etc., etc., etc."

Now there was an obstacle, in the way of a complete control of the river by the defendant company, in the existence, within its limits under its amended charter, of a company owning a dam at the outlet of Chesuncook lake with a right of collecting a toll on all logs passing over such dam. The company could not purchase the dam having neither money nor the means of raising money to buy it with, as it was empowered to assess logs only for the legitimate and necessary expenses of driving the logs. But a scheme was hit upon to allow the toll to continue until the owners should be reimbursed for the balance due on its cost, with expenses and interest, and the dam then to become the property of the log-driving company. And so the legislature provided, among other details, by chapter 86 of the Laws of 1847, certain rights for the owners of Chesuncook Dam, "upon the further condition that if said corporation shall collect the sum in tolls as provided in the second section of this act, under and by virtue of this act, it shall be in full compensation to said corporation for their said dam, and then the same shall become the property of the Penobscot Log-Driving Company, and be free to the public without the payment of toll." The same act contains precisely the same provisions as to the North Twin dam situated on a lower lake, the defendant company to have and own the same when the owners should receive compensation for their outlay by collection of the tolls prescribed by the legislature. The words in this act, "and shall be free to the public without the payment of toll" was an awkward way of saying that the franchises of such corporations should be terminated, but the words are without special significance in this connection. The legislature takes the property in these dams from those corporations and gives it to the Penobscot Log-Driving Company, for the purpose for which the company has been for well

nigh fifty years using such dams. For that period have both the dams been kept constantly in repair and been many times rebuilt by the log-driving company. No toll is demanded or received for logs passing them. No West Branch drive can be made without the stores of water held in reserve by such dams.

It is plainly manifested by the foregoing quotations from the statutes that the legislature intended to impose upon the defendant company the duty of including in its drives all logs of all owners in the West Branch waters; and it is just as strongly manifested that the legislature also intended that the company should possess the exclusive control and management of the waters of the river, so far as necessary to enable it to successfully execute the obligation resting upon it, an obligation in some respects partaking of the character of a public trust. The permission of the state was to take all the water for the purpose of driving all the logs. There can be no doubt that the company would be liable in damages for negligence in omitting to drive any owners' logs; and it has been so decided in *Weymouth* v. *Pen. Log-Driving Co.*, 71 Maine, 29. No occasion has hitherto arisen requiring any decision of the question whether the company is entitled to drive the logs of an owner against his consent, and for the reason that no owner has ever had any motive to reject the benefits of having his logs driven by the corporation. And in the present case the plaintiff would have had no such motive could his logs have been left at Montague instead of in the boom at Oldtown.

But it is argued, in behalf of the plaintiff, that the state does not possess the right to create a monopoly in the use of any of the public waters in favor of this corporation. It is, however, too late in the history of that question to set up such a contention now. The state represents all public rights and privileges in our fresh water rivers and streams, and may dispose of the same as it sees fit. The principle is settled in no state more firmly than in this. *Parker* v. *Cutler Milldam Co.*, 20 Maine, 353; *Lee* v. *Pembroke Iron Co.*, 57 Maine, 481; *Treat* v. *Lord*, 42 Maine, 560; *Moor* v. *Veazie*, 32 Maine, 343; Same case 31 Maine, 360; *Veazie* v. *Moor*, 14 How. (U. S.) 568; *Brooks* v. *Cedar Brook etc. Imp.*

*Co.*, 82 Maine, 17; *State* v. *Leighton*, 83 Maine, 419; Gould. Waters, (2d. ed.) § 36, and cases.

In view of the foregoing considerations, it is contended in behalf of the defendant company that the plaintiff can have no standing in court for the reason that the company had the right to take his logs and include them with the mass of logs in the main West Branch drive. While that would undoubtedly be the rule as far as any logs are concerned which may come legitimately into the possession and under the control of the company, the court is of opinion that the same rule should not apply as to the plaintiff's logs whose place of destination was Montague instead of the Penobscot boom. As the company were allowed or required to drive all logs and timber "to any place at or above the Penobscot boom where logs are usually rafted," and as Montague is not such rafting place and logs cannot be stopped there when the main drive is passing that point, the interpretation is that these logs never came within the possession or jurisdiction of the company for the purpose of being driven under the authority of its charter. Nor could the company be compelled to receive and drive logs not bound for the Penobscot boom. It might be otherwise should the company establish a rafting place at Montague. Undoubtedly there was no expectation in 1847, when the log-driving company was incorporated, that logs would ever be driven down Penobscot river whose place of destination would be other than the Penobscot boom, and the changes of the present day could not have been anticipated. Possibly changes in legislation may be necessary to meet such changes of business, such as will be just and equitable.

What then were the rights of the plaintiff in the waters of the West Branch, with logs in his possession below Chesuncook dam whose place of destination was Montague? He undoubtedly possessed such common-law right of passage for his logs as had not been granted to the Penobscot Log-Driving Company by the state, such and so much use of the water as would not hinder or prevent the company from its enjoyment and use of all the water necessary for its purposes under its prior and privileged right thereto.

The plaintiff was under no circumstances legally entitled to

more than the natural flow of the stream. That would be the extent of his common-law right, and he was not included in the statutory right granted by the legislature. *Pearson* v. *Rolfe*, 76 Maine, 380; *Foster* v. *Searsport Spool-wood and Block Co.*, 79 Maine, 508; *Stratton* v. *Currier*, 81 Maine, 497. Therefore, he had no right to require the defendant to provide him with any part of the stores of water which it had in reserve within its dam or dams, unless he was entitled to the natural flow and it became necessary to use some of the reserved stores in order to create a flow equal to the natural run or flow. And if the dam was full and overflowing then he got the full natural flow. The natural amount of water may flow over a dam as well as under it or through its gates. It is not just or equitable for log owners outside of the company to claim to use without compensation its stores of water which have cost many thousands of dollars to produce. And if one person after another should have the privilege of tapping such stores, it would soon deprive the company of all power to perform its most imperative obligations.

But the plaintiff was not entitled even to the natural flow, or to draw from the reserves of water in order to create what would at the time and place be equivalent to the natural flow, so long as the company needed or would be likely to need the same water for driving its own logs to market. The defendant's right was the superior right. The plaintiff's right was secondary and conditional. Such is the inevitable effect of the grants to the company by the legislature. The stores of water are accumulated by using the natural flow until the necessary head is obtained. It was not that the defendant company would not let the water down when it needed its use itself, but the plaintiff desired the use and advantage of it in advance of the use of it by the company.

Upon the question whether the company could safely spare any of its accumulated stores of water in order to supply the plaintiff's logs with what would be equivalent to the natural run, all circumstances affecting the situation should be carefully considered, both present and prospective. Certain geographical facts should be taken into the calculation. It is generally known that the West

Branch drive usually consists of about fifty millions feet of lumber; that the drive has to travel in the crookedness of the river eighty or ninety miles after being turned over Chesuncook dam before it reaches its destination within Penobscot boom; that the drive starts late in the season because it is detained in the lake until the last contributory drives come into the lake from the streams and brooks above; that the drive arrives usually in the drought of summer, scarcely ever earlier than some time in August, depending entirely for its success in reaching Penobscot boom upon the accumulations of water held back by the dams at the outlets of several lakes; that all the sources of water are not always enough for successful driving, portions of the drive being not infrequently left on the way for the want of sufficient water; that the company sometimes finds it necessary to send water along in advance of its drive to clear the river of obstructions caused by drives of logs from the other branches of Penobscot river that have become crippled and stuck for want of sufficient freshet to move them along; and that for the causes named, as well as other reasons that might be named, the duties of the company to the public are responsible in the extreme in bringing such mass of logs to the possession of their many owners with safety.

*Action to stand for trial.*