[No. 26175. *En Banc.* August 4, 1936.]

THE STATE OF WASHINGTON, *on the Relation of Steve Bacich, Plaintiff,* v. HARRY C. HUSE, *as State Director of Licenses, Respondent.*[1]

¹Reported in 59 P. (2d) 1101.

76

*James L. Dougherty* and *Clarence J. Coleman,* for relator.

*The Attorney General, George Downer,* and *L. C. Brodbeck, Assistants,* for respondent.

STEINERT, J.—This is an original application made in this court for a writ of mandamus to compel the respondent to issue to the relator a license to take salmon fish from the waters of Puget Sound by means of a gill net.

At the general election held on November 6, 1934, initiative measure No. 77, relating to the taking and catching of fish, was passed by vote of the people. The law became effective December 3, 1934, and now appears as chapter 1, Laws of 1935, p. 4 *et seq.,* Rem. 1935 Sup., §§ 5671-1 to 5671-11 [P. C. §§ 2534-21 to 2534-31], inc.

By § 1, p. 4, of the act (Rem. 1935 Sup., § 5671-1 [P. C. § 2534-21]'), it is made unlawful to fish for, catch, or take any "species of salmon or salmon trout, trout, or steel head," *except as in the act provided,* with any appliance, or by any means whatever, except with hook and line, within certain designated waters of the Straits of Juan de Fuca or Puget Sound. Further reference to this section will be made later herein.

The immediate purpose of this action is to test the constitutionality of that portion of § 4, p. 5, of the act (Rem. 1935 Sup., § 5671-4 [P. C. § 2534-24]'), which reads as follows:

"Any person, firm or corporation, who shall have held in either the years 1932 or 1933 a license from the director of licenses of the State of Washington, for the operation within the waters of Puget Sound of any gill net, may be licensed for the operation of, and may operate, a gill net, for the purpose of catching salmon only, according to the fishing regulations of the fisheries department of the State of Washington for gill nets for the year 1933, within the waters described in the first section of this act for each succeeding year after the taking effect of this act, by making application therefor to said director of licenses, and paying to the treasurer of the State of Washington the sum of seven and 50/100 dollars ($7.50) for each year for which such license is issued; and no other person, firm, or corporation, shall be licensed hereafter to operate, or hereafter shall operate, a gill net in the waters so described in said first section. Said license shall be personal; and neither said right, nor any license issued pursuant thereto, shall be transferable, either voluntarily or involuntarily, or by operation of law. If said licensee shall fail during any year to apply for such license, his right to be licensed thereafter shall terminate: . . ."

Immediately following the language just quoted, is a proviso in the section, reading thus:

"*Provided,* That if for any reason any of the fore-

going provisions of this section shall be held to be unconstitutional, no license shall be issued to any person, firm, or corporation, for the operation of a gill net within any of the waters described in said first section, *except as may be permitted by the fisheries department of the State of Washington under existing law."* (Italics ours.)

The relator did not hold a gill net license for the year 1932 or for 1933, and, for that reason alone, his application for a license for the year 1936 was refused by the respondent.

The contention of relator is that § 4 of the act, exclusive of the proviso, violates the following constitutional provisions: (1) Art. I, § 12, of the state constitution, prohibiting special privileges and immunities; (2) that provision of the fourteenth amendment of the United States constitution which prohibits the denial of the equal protection of the laws to any person within the state; and (3) Art. XII, § 22, of the state constitution prohibiting monopolies. We shall consider only the first and second grounds of the contention.

Art. I, § 12, of the state constitution reads as follows:

"No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

The fourteenth amendment of the constitution of the United States, in so far as it is pertinent here, reads as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . nor deny to any person within its jurisdiction the equal protection of the laws."

If § 4 of the above act, exclusive of the proviso, be

held constitutional, then relator would not be entitled to a license. If, however, it be held unconstitutional, then he would be entitled to the issuance of a license unless § 1 of the act, read in connection with the proviso in § 4, is to be construed as prohibiting all fishing with gill nets.

By way of preface, it may be observed that, in the case of *State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P. (2d) 24, it was held that a provision in the act here involved exempting "Indians under Federal regulation" from the application of § 8 of the act relating to the use of pound nets, fish traps, fish wheels, and similar appliances, did not render the act unconstitutional, in violation of Art. I, § 12. But that case did not touch the question here. By express reference, it was therein stated that § 4, with which we are here concerned, had no application to the situation then before the court. So we approach the immediate question before us as one unaffected by any previous decision upon the subject.

At the outset, we may repeat what has many times been held by this court, namely, that the food fish in the waters of this state belong to, and are the sole property of, the people thereof; that no person has any inherent or natural right to take such fish as against the state; that the state, in prescribing regulations with respect to taking fish from its waters, is dealing with its own property, over which its control is as absolute as that of any other owner over his property; and that any private right in that regard must be expressly or inferentially given by the state. *State v. Tice,* 69 Wash. 403, 125 Pac. 168, 41 L. R. A. (N. S.) 469; *Cawsey v. Brickey,* 82 Wash. 653, 144 Pac. 938; *Vail v. Seaborg,* 120 Wash. 126, 207 Pac. 15; *McMillan v. Sims,* 132 Wash. 265, 231 Pac. 943; *State v. Cramer,* 167 Wash. 159, 8 P. (2d) 1004.

But it is equally true, and as uniformly held, that, while the state owns the fish in its waters in its proprietary capacity, it nevertheless holds title thereto as trustee for all the people of the state and for the common good, and, therefore, regulations made for the use of this common property must bear equally on all persons similarly situated with reference to the subject matter and purpose to be served by the regulation. *Cawsey v. Brickey,* 82 Wash. 653, 144 Pac. 938; *Barker v. State Fish Commission,* 88 Wash. 73, 152 Pac. 537, Ann. Cas. 1917D, 810; *State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P. (2d) 24.

The aim and purpose of the special privileges and immunities provision of Art. I, § 12, of the state constitution and of the equal protection clause of the fourteenth amendment of the Federal constitution is to secure equality of treatment of all persons, without undue favor on the one hand or hostile discrimination on the other.

To comply with these constitutional provisions, legislation involving classifications must meet and satisfy two requirements: (1) The legislation must apply alike to all persons within the designated class; and (2) reasonable ground must exist for making a distinction between those who fall within the class and those who do not.

Within the limits of these restrictive rules, the legislature has a wide measure of discretion, and its determination, when expressed in statutory enactment, cannot be successfully attacked unless it is manifestly arbitrary, unreasonable, inequitable, and unjust. *State v. McFarland,* 60 Wash. 98, 110 Pac. 792; *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466; *Litchman v. Shannon,* 90 Wash. 186, 155 Pac. 783; *State v. Cannon,* 125 Wash. 515, 217 Pac. 18; *Northern Cedar Co. v. French,* 131

Wash. 394, 230 Pac. 837; *Garretson Co. v. Robinson,* 178 Wash. 601, 35 P. (2d) 504.

■ It is apparent that § 4 of the act applies alike to all persons within the designated class, namely, those who held licenses in either the year 1932 or 1933. The question then remains whether there is any reasonable basis for distinction between persons who held licenses in either of those years and persons who did not. In our opinion, there is no reasonable basis for such distinction. We are of the belief that the classification is not predicated on any fair, just, or natural basis of selection, but is wholly arbitrary and capricious.

Respondent begins with the premise that one of the fundamental objects sought by the act was the conservation of the state's supply of food fish. This may be conceded. Respondent then advances, as a reason for the discrimination and classification, the fact that, at the time of the adoption of the initiative measure, it was recognized that there was a large number of people in the state whose sole means of livelihood was gill netting within the prohibited area, and that it would have been a grave injustice to deprive them of their livelihood; hence, by the provisions of § 4 of the act, such persons were to be permitted to follow their accustomed vocation during the remainder of their lives, while all others were to be prohibited.

The argument possesses some measure of plausibility as indicating a beneficent complaisance on the part of a sovereign state toward certain of its citizens suddenly embarrassed by the quick and decisive turn of things. But the argument, we think, is not legally sound, and its weakness is, in our opinion, demonstrable.

In the first place, as already stated, the state holds title to the fish within its waters in trust for all its people and for the common good, not simply for a limited few nor for the good of a small minority. The state cannot dispose its bounty in favor of particular persons and withhold it from all others who have equal right or claim. This case does not present a factual situation requiring the exercise of regulatory functions with respect to an industry generally and directed toward certain professions, vocations, or pursuits, with the view of establishing such qualifications as will best promote the health, morals, or welfare of the people. The regulation, if it may be so called, is founded upon mere fortuitous circumstances and makes a gratuitous selection of individuals who shall enjoy the use of common property to the exclusion of all others.

In the next place, the special privilege accorded by § 4 of the act does not accomplish the purpose suggested by respondent's argument. The privilege is expressly limited to those holding licenses for either the year 1932 or 1933. Those whose licenses were for the year 1934 only were excluded, as were those who held licenses for any year prior to 1932. We have, then, a peculiar state of affairs. The man who had a license during the year that the initiative measure went into effect, namely, 1934, and who was actually operating thereunder at the time, would not be entitled to a license thereafter, pursuant to the act, unless he had also been licensed in either 1932 or 1933. On the other hand, the man who happened to have a license in 1932, although he had none in 1933 or 1934, or who happened to have a license in 1933 but none in 1934, and although he had in the meantime disposed of all of his equipment, would still be entitled to receive a license in 1935 or 1936 under the provisions

of § 4. In other words, those who were immediately engaged in gill net fishing at the time of the adoption of the initiative measure would not by that fact alone be guaranteed a continued means of livelihood, while those who had been engaged in the same business in 1932, but who had ceased in the meantime, would be entitled to resume. If the act contemplated the protection of those who had some semblance of a right to protection, the purpose failed of accomplishment.

To illustrate the vice, or at least the unfairness or injustice, of the situation, we may draw an analogy from a kindred field in which the state exercises its untrammeled rights. The state owns and controls certain highways. It maintains them, however, for use by the people at large. It is directly and immediately interested in the conservation of such highways to the end that the public use thereof may be adequately protected. Suppose that, in the interest of conservation of such highways, a statute were enacted, or an initiative measure adopted, specifying that trucks of a certain size or tonnage should no longer be permitted to use such highways. It is conceivable that, in the interest of conservation, such legislation would be proper. But suppose that the statute or initiative measure should provide that only such persons as had held licenses to drive trucks of the prohibited class during either the year 1932 or 1933 should thereafter be permitted to use them upon such highways, while all other persons, including those who held licenses immediately preceding the effective date of the legislative act, were excluded. Would that be considered a fair or legal discrimination? We think not. We believe that such action would be a dedication *pro tanto* of the use of the roads to a special class upon a wholly arbitrary and capricious basis.

A classification, to be legal and valid, must rest on

real and substantial differences bearing a natural, reasonable, and just relation to the subject matter of the act in respect to which the classification is made. The distinctions giving rise to the classification must be germane to the purposes contemplated by the particular law and may not rest upon a mere fortuitous characteristic or quality of persons, or upon personal designation. In short, the classification cannot be an arbitrary selection. These principles have been so frequently stated and so thoroughly recognized that it is unnecessary to cite any authority in their support.

The classification made by § 4 of the act in question can have no natural, reasonable, or just relation to the subject matter of the act. If conservation be the end sought, it is not promoted by selecting a particular class of persons on an arbitrary basis and conferring special privileges on them and denying the same privileges to all others. Concededly, regulations might be prescribed which would tend to accomplish the desired result. But such regulations should not only apply to all persons equally, but should be of such nature as that all persons would at least have an equal chance to conform thereto. The provisions of the present act draw a line and erect a barrier which prevent all persons, except a chosen few, from ever crossing them, or from ever qualifying themselves for the privilege within the dispensation of the state. The selection rests upon mere accident or circumstance, and not upon conditions effecting a natural line of cleavage. We are of the opinion, and hold, that § 4 of the act, exclusive of the proviso, is unconstitutional and void.

The respondent contends, however, that, even though § 4 of the act be held unconstitutional, still the relator would not be entitled to have a license issued to him because of other prohibitive provisions

of the act. The argument is that, if § 4 in its entirety be eliminated, then under § 1 of the act no one shall or may operate a gill net within the prohibited area; or, if the proviso in § 4 be allowed to stand, then only such licenses may be issued as are permitted by the fisheries department under rules and regulations prescribed by it, and since no rules or regulations have yet been formulated by that department, relator's application for a license is premature. The argument is ingenious, but we do not agree with it.

█ The proviso is clearly severable from the remainder of § 4. In fact, it prescribes the procedure to be followed in the event that the remainder of the section be held unconstitutional. We therefore regard the proviso as still extant.

It may be proper to note here the exact language of § 1 of the act, in so far as it is pertinent to the present case. It reads:

"It shall be unlawful to fish for, catch, or take any species of salmon . . . *except as hereinafter provided,* with any appliance, or by any means whatever . . . within the waters of the straits of Juan de Fuca, Puget Sound and waters connected therewith within the State of Washington . . ." (Italics ours.) Rem. 1935 Sup., § 5671-1 [P. C. § 2534-21].

It will be observed that this section is not an absolute prohibition against all fishing, by any and all means, within the prohibited area, but only against such fishing as is not excepted by subsequent provisions of the act. The exception, therefore, relates to, and must be considered in the light of, the proviso in § 4, as well as other portions of the act. Though stated in negative form, the proviso recognizes that licenses may be issued for the operation of gill nets within the prohibited area, but only as permitted by the fisheries department "under existing law." Sec-

tion 5, p. 6, of the act provides, among other things, that no fisherman shall employ any appliance or device, referred to in § 8, p. 6, of the same act, for the catching of fish, or any gill net *except as provided in § 4.* The phrase "under existing law," used in the proviso in § 4, has reference to the entire law as it stood when the act became effective and not merely to those rules and regulations which might thereafter be adopted by the fisheries department, although it may be conceded that the fisheries department has the power to make further rules for the regulation of fishing. It is clear from § 4 itself that the legislature intended that licenses should be issued and fishing operations conducted according to fishing regulations in existence immediately prior to the adoption of the initiative measure.

Rem. Rev. Stat., § 5703 [P. C. § 2460], provides for the issuance of various kinds of fishing licenses, including gill net licenses, and prescribes a detailed rate of fees therefor. Rem. Rev. Stat., § 5695 [P. C. § 2452], designates the persons who shall be eligible to obtain such licenses. Rem. Rev. Stat., § 10868 [P. C. § 4-110], confers upon the state fisheries board the power to promulgate rules and regulations fixing the times when, and the places where, fishing operations may be conducted, and the means and appliances to be used. This power was transferred from the state fisheries board to the director of fisheries and game by Rem. Rev. Stat., § 10867-1 [P. C. § 4-109a]. The delegation of these powers to the state fisheries board was upheld in *McMillan v. Sims,* 132 Wash. 265, 231 Pac. 943.

These sections of the statute to which we have just referred have never been expressly repealed, nor have they been impliedly repealed by initiative measure No. 77, except in certain respects which are not material here. In so far as they relate to the issuance of li-

censes for gill netting operations, these sections of the statute constitute a part of the "existing law." It is indeed true that, under the law, even as it now exists, the director of fisheries may establish proper rules and regulations for the operation of gill nets, but whatever such rules and regulations now are, or ultimately may be, they must bear equally upon all persons qualified under the law to seek licenses.

We conclude, therefore, that the relator is entitled to a license to operate a gill net for the year 1936, under the same terms and conditions as are imposed upon all other gill netters operating under the act during the same year.

A writ of mandamus may accordingly issue.

TOLMAN, MAIN, MITCHELL, BEALS, and GERAGHTY, JJ., concur.

HOLCOMB, J. (concurring in the result)—Although I feel that some of the analogies and hypotheses in the prevailing opinion are unnecessary and not germane, I am most heartily in accord with the result: that the portion of § 4 condemned, undoubtedly contravenes Art. I, § 12, of the state constitution, which is the only question with which we should concern ourselves. I doubt whether relator is in any way denied any rights under the 14th amendment to the Federal constitution.

BLAKE, J. (dissenting)—What are the privileges and immunities of citizens protected by the constitution? In *Corfield v. Coryell*, 4 Wash. C. C. 371, 6 Fed. Cas. 546, Washington, J., answered:

"We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, *fundamental;* which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the

several states which compose this union, from the time of their becoming free, independent and sovereign.''

The constitutional guaranties of equal protection and against special privileges and immunities have ever been construed in the light of the right of the state to exercise its police power. In his work on Constitutional Limitations (8th ed., vol. 2, pp. 813, 817, 824, 825), Cooley says:

''But a State may classify with reference to an evil to be prevented, and if the class discriminated against is, or reasonably might be, considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one, dependent upon experience. . . .

''There are unquestionably cases in which the State may grant privileges to specified individuals without violating any constitutional principle, because, from the nature of the case, it is impossible they should be possessed and enjoyed by all; and if it is important that they should exist, the proper State authority must be left to select the grantees. . . .

''It (the equal protection clause) merely requires that all persons subject to such legislation shall be treated alike, under like circumstances and conditions, both in privileges conferred and liabilities imposed. It is not infringed by legislation which applies only to those persons falling within a specified class, if it applies alike to all persons within such class, *and reasonable grounds exist for making a distinction between those who fall within such class and those who do not.*'' (Italics mine.)

And in *Patsone v. Pennsylvania*, 232 U. S. 138, 34 S. Ct. 281, Mr. Justice Holmes, speaking for the court, said: ''It is not enough to invalidate the law that others may do the same thing and go unpunished.''

This principle has been repeatedly applied in upholding legislation discriminating in favor of one class

of citizens against all others in the right to fish in the public waters of the state. In *State v. Leavitt,* 105 Me. 76, 72 Atl. 875, 26 L. R. A. (N. S.) 799, the court had before it a municipal ordinance which provided:

" 'No person shall take or dig or destroy in any manner clams in any of the shores or flats within the town of Scarboro . . . .

" 'The aforesaid section shall not apply to inhabitants or residents of said town taking clams for the use of himself and family nor to hotel keepers within the town taking clams for the use of their hotels.' "

Holding the ordinance a constitutional exercise of the police power, the court said:

"Although there are a few authorities which seem to hold that a public right of fishery is inalienable by the State, the great weight of authority and judicial expression is to the effect that the State in the exercise of its power of regulation and control may grant exclusive rights of fishery to individuals. *Com. v. Hilton, supra,* [174 Mass. 29, 54 N. E. 362, 45 L. R. A. 475]; *Com. v. Vincent,* 108 Mass. 441; *Burnham v. Webster,* 5 Mass. 265 (which was a Scarboro case); *Cleaveland v. Norton,* 6 Cush. (Mass.) 380; *Wooley v. Campbell,* 37 N. J. L. 163; *Gough v. Bell,* 22 N. J. L. 441; *Lakeman v. Burnham,* 7 Gray (Mass.) 437; *Hathaway v. Thomas,* 16 Gray (Mass.) 290; *Com. v. Bailey,* 13 All. (Mass.) 541; *Chalker v. Dickinson,* 1 Conn. 382 [6 Am. Dec. 250]; *Hickman v. Swett,* 107 Cal. 276 [40 Pac. 420]; *Ex Parte Maier,* 103 Cal. 476 [37 Pac. 402, 42 Am. St. 129]; *Geer v. Connecticut,* 161 U. S. 519 [16 S. Ct. 600, 40 L. Ed. 793]. See *Moor v. Veazie,* 32 Me. 343 [52 Am. Dec. 655]; *Mullen v. Log Driving Co.,* 90 Me. 555 [38 Atl. 557]. . . .

"But discrimination, to be constitutional, must be based upon some reasonable ground,—some difference which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection. *Gulf, Colorado & Santa Fe Ry. v. Ellis,* 165 U. S. 150 [17 S. Ct. 255, 41 L. Ed. 666]; *State v. Montgomery,* 94 Me. 192 [47 Atl. 165, 80 Am. St. 386].

It must be reasonable and based upon real differences in the situation, condition or tendencies of things.''

Turning now to initiative No. 77, let us examine it in the light of these principles. The obvious and sole purpose of the act is conservation of salmon. As such we have upheld it against attack by the owners and operators of fish traps. *State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P. (2d) 24. The consequence of that decision was to recognize the legislative power to discriminate against fishermen using one kind of gear in favor of those using another. In that case, we said:

"The relator next contends that the act is unconstitutional as being an arbitrary, unreasonable and whimsical exercise of the police power of the state, depriving him of his property without due process of law. Relator's argument under this head is devoted largely to questions of policy and the economic importance of the salmon industry in this state. These issues are for the legislative authority of the state to determine and doubtless were brought to the attention of the electors of the state in the canvass preceding the adoption of initiative No. 77. We cannot assume to revise their judgment upon these questions of policy and expediency.''

And quoting from *Smith v. State,* 155 Ind. 611, 58 N. E. 1044, 51 L. R. A. 404, we further said:

" 'The individual has no natural right to take game, or to acquire property in it, and all the right he possesses or can possess in this respect is granted him by the state.' ''

The discrimination approved in that case, of course, was predicated on the ground that the continued use of traps and other fixed gear might eventually exterminate the salmon.

Now, the gill net is somewhat of the nature of a trap, in that it is set in a fixed location in waters

through which the salmon run. If the gill net is permitted to be used by all who apply for license, obviously the evils sought to be corrected by the abolition of traps will continue unabated. For it is certain that licenses will be obtained for gill net operations at every trap location abolished in the waters described in the act.

It was doubtless this probability that caused the framers of the act to discriminate, in gill net operations, in favor of those who held licenses in either of the years 1932 or 1933. Doubtless (at least we are to presume), a survey showed that gill netting could be continued by such number of fishermen as held licenses in 1932 and 1933 without menacing the salmon industry as a whole—without fear of extermination.

Finally, to uphold this provision of the act will not deprive relator of a privilege of which he has heretofore availed himself. On the other hand, the effect of this decision will be to deprive others of a livelihood—a privilege of which they had availed themselves and which they had exercised for years. For, if gill net licenses must be issued to all who apply, it is obvious that, in the interest of conservation, the gill net must go the way of the trap.

Since the discrimination with respect to gill net operations is based on reasonable and substantial grounds, the provisions of § 4 are not violative of any constitutional guaranty to which relator can lay claim. I dissent.

MILLARD, C. J., concurs with BLAKE, J.