Maxwell, J.
This was an action of replevin involving 300 deer hides.
The amended complaint upon which this case was tried averred that, prior to January 28, 1901, plaintiff was the owner and entitled to the possession of, and is now the owner and entitled to the immediate possession of, 300 deer hides of the value of $300.00; that about December 10, 1901, the defendant, representing himself to he a deputy game warden, wrongfully, unlawfully and forcibly took said deer hides from plaintiff’s possession; that on said date “the defendant, as such deputy game warden, in consideration of the sum of $30.00 to him in hand paid by this plaintiff, retransferred and delivered the said deer *15 hides to this plaintiff, stating to said plaintiff at such time that as such deputy state game warden he had the right to transfer the same to this plaintiff and receive the consideration therefor”; that thereafter, and before the commencement of this suit, the defendant again took possession of said hides, and upon demand refused to deliver the same to plaintiff, to his damage in the sum of $300.00.
An answer and replication presented the issues, upon which the ease was tried.
A determination of the questions involved in this case involves a consideration of several sections of chapter 98 of the Session Laws of 1899, entitled, “An act to protect game and fish,” Session Laws of 1899, page 184, as follows:
Section 16, Div. A, page 188: “All game and fish now or hereafter within this state not held by private ownership, legally acquired, and which for the purposes of this act shall include all the quadrupeds, birds and fish mentioned in this act, are hereby declared to be the property of the state, and no right, title, interest or property therein can be acquired or transferred, or possession thereof had or maintained, -except as herein expressly provided.”
Section 18, Div. A, page 189: “As used in this act, unless otherwise specifically restricted or enlarged, the words herein and hereof refer to the whole act; * * * and whenever the possession, use, importation, transportation, storage, taxidermy, sale, offering or exposing for sale of game or fish is prohibited or restricted, the prohibition and restriction shall, where not specifically otherwise provided, extend to and include every part of such game or fish, and a violation as to each individual animal or part thereof shall be a separate offense. ’ ’
Section 19, Div. A, page 189: ‘ ‘ The possession at any time of game or fish unaccompanied by a *16 proper and valid license, certificate, permit or invoice, as herein provided, shall be prima facie evidence that such game or fish was unlawfully taken and is unlawfully held in possession. ”
Section 1, Div. B, page 191: “No person shall at any time of the year, or in any manner, pursue, take, wound or kill any bison, buffalo, elk, deer, antelope * * * or have the same in possession, except as permitted by this act.’.’
Subdiv. 1, Section 7, Div. B, page 192: “The open season for deer having horns and antelope having horns, shall begin August 15, and end November 5 next ensuing.”
Subdiv. 7, Section 7, Div. B, page 192: “The right given by this section to take or kill game and fish is limited to food purposes * * * and no person shall take, kill or have in possession in any one season more than one elk, and one deer and one antelope; or, instead of one deer and one antelope, he may have either two deer or two antelope.”
Subdiv. 8, Section 7, Div. B, page 193: “No game or fish shall be held in possession by any person for more than five days after the close of the season for killing the same, except as in this act otherwise provided. ’ ’
Section 11, Div. D, page 207: “When any person lawfully in possession of game or fish shall desire to transport the same within this state, the transportation of which is not herein otherwise provided for, or out of this state, the commissioner may, upon being-satisfied that the possession and transportation is not in violation of the spirit of this act, grant a permit therefor, and thereafter, during the period of ten days after its date, such transportation shall be lawful between the points therein named. Such permit shall be substantially in the following form:
*17 Form 11.
State of Colorado.
Department of Game and Fish. Transportation Permit.
Denver,.......................189. ..
No............
This certifies that Mr...............is entitled to transport from.....................Colorado, to ....................the following game and fish, to wit:............................................. This authorizes possession and transportation between the points named herein only, but not sale or storage. Void after ten days from date.
Commissioner. ’ ’
Section 13, Div. D, page 209: “Game or fish may be transported out of this state only when accompanied by a permit from the commissioner authorizing the same, as provided in section 11 of this division. ’ ’
Section 11, Div. A, page 187: ‘ ‘ The commissioner and every warden throughout the state, and every sheriff and constable in his respective county, is authorized and required to enforce this act and seize any game or fish taken or held in violation of this act. ’ ’
Section 9, Div. D, page 206: “All game and fish seized under this act shall, without unnecessary delay, be sold by the officer seizing the same, or by the commissioner, except when a sale is impracticable or is likely to incur expenses exceeding the proceeds, in which case the same shall be donated to any needy person not concerned in the unlawful killing or possession thereof. Possession by virtue of such sale or donation shall not be unlawful. The proceeds thereof, after deducting the costs of seizure and sale, shall, if made by the commissioner or any warden, be paid *18 into the state treasury, but if made by a sheriff or constable, shall be paid, one-half to the commissioner and one-half into the treasury of the county where the seizure was made.”
Section 10, Div. D, page 207: “In case of such seizure and disposition, the officer making the same shall sign and give to each purchaser or donee an invoice stating the time and place of disposition, the kind, quantity and weight, as near as may be, of the game or fish disposed of, and the name of the purchaser or donee.' Such invoice shall authorize possession, transportation within this state, storage and sale for thirty days after date, and shall be substantially in the following form:
Form 10.
State of Colorado.
Department of Game and Fish.
Officer’s Invoice.
• .............................189...
Disposed of by me this day to................ the following game and fish, to wit: Kind.........; number................; weight.............; the same having been seized and disposed of by me under the provisions of the game law. This authorizes possession, storage, transportation within this state, and sale. Void after thirty days from date.
(Title of Officer) ”
Section 16, Div. D, page 209: “Any person having the lawful possession of game or fish killed within this state may, upon proof of such fact, have issued to him by the commissioner a storage permit which shall authorize storage, possession and use of the same not longer than ninety days next ensuing the open season therefor. Such permit shall be substantially in the following form:
*19 Form 12.
State of Colorado.
Department of Game and Fish.
Storage Permit.
No.......... Denver,................189. ..
Mr.................. residing at.............. being in the lawful possession of.................. killed within this state, is entitled to have the same kept in storage until..............'.....nest. This authorizes storage, possession and personal use until the date last mentioned above, but not transportation or sale.
Commissioner. ’ ’
It appears by the admissions of the answer and' the evidence, that the first seizure of the hides made by defendant as deputy sheriff, was December 10, 1900,- the second seizure, and the one complained of in the complaint, was made by defendant as deputy game warden, January 28, 1901.
The case was tried to a jury, resulting in a verdict and judgment against defendant for $350.00, from which this appeal.
In their final analysis, the errors relied upon for a reversal of the judgment rendered by the court below, present but one question, viz: Was the plaintiff the owner and entitled to possession of the 300 deer hides sued for?
This is the first ease under the game and fish laws of this state winch has found its way into an appellate court, probably due to the fact that most cases of this character are of a criminal nature, and, owing to peculiar local conditions, convictions have been almost, if not quite, impossible*, thus leaving the state without remedy to enforce these most salutary laws.
In view of the foregoing statement, and the im *20 portance of the subject, the presentation of some of the genera] principles upon which such laws are based may not be considered untimely.
The leading ease on this subject is Geer v. Connecticut, 161 U. S. 519, in which Mr. Justice White delivered the opinion of the court. Geer was convicted under a statute of Connecticut which made it unlawful to have in possession certain game birds with the intention of transporting them beyond the limits of the state. The main question presented was, whether the statute applied to birds which had been killed in the open season. The case found its way to the U. S. supreme court, upon the point that it was in violation of the interstate commerce clause of the federal constitution. Mr. Justice White, in the course of his opinion, reviews the origin, growth and development of game laws. He says, inter alia:
‘ ‘ From the earliest traditions, the right to reduce animals ferae naturae to possession has been subject to the control of the law-giving power. ’ ’
Fie then traces the growth and development of such laws from the earliest times down to the common law of England, and says:
“The common law of England also based property in game upon the principle of common ownership, and therefore treated it as subject to governmental authority.
“Blackstone, while pointing out the distinction between things private and those which are common, rests the right of an individual to reduce a part of this common property to possession, and thus acquire a qualified ownership in it, on no other or different principle from that upon which the civilians based such right. — 2 Bl. Comm. 1, 12. * * *
“The practice of the government of England from the earliest time to the present has put into execution the authority to control and regulate the tak *21 ing of game. Undoubtedly this attribute of govern^ ment to control tbe taking of animals ferae naturae, whicb was thus recognized and enforced by the common law of England, was vested in the colonial governments, where not denied by their charters or in conflict with grants of the royal prerogative. It is also certain that the power which the colonies thus possessed passed to the states with the separation from the mother country, and remains in them at the present day, in so far as its exercise may be not incompatible with, or restrained by, the rights conveyed to the federal government by the constitution. Kent, in his commentaries, states the ownership of animals ferae naturae to be only that of a: qualified property. (2 Kent Comm. 347.) In most of the states, laws have been passed for the protection and preservation of game. We have been referred to no case where the power to so legislate has been questioned, although the books contain cases involving controversies as to the meaning of some of the statutes. (Citing a large number of authorities.)
“While the fundamental principles upon which the common property in game rest have undergone no change, the development of free institutions has led to the recognition of the fact that the power or control lodged in the state, resulting from this common ownership, is to be exercised, like all other powers of government, as a trust for the benefit of the people, and not as a prerogative for the advantage of the government as distinct from the people, or for the benefit of private individuals as distinguished from the public good. *' * *
“The foregoing analysis of the principles upon which alone rests the right of an individual to acquire a qualified ownership in game, and the power of the state, deduced therefrom, to control such ownership for the common benefit, clearly demonstrates the *22 validity of the statute of the state of Connecticut here in controversy.”
The constitutional question involved in the case was then disposed of by declaring that the statute under consideration did not violate the federal constitution.
Referring to some cases in Kansas and Idaho holding otherwise on the question of export, Justice White says:
‘ ‘ The reasoning which controlled the decision of these cases is, we think, inconclusive, from the fact that it did not consider the fundamental distinction between the qualified ownership in game, and the perfect nature of ownership in other property, and thus overlooked the authority of the state over property in game killed within its confines, and the consequent power of the state to follow such property into Avhatever hands, it might pass with the conditions and restrictions deemed necessary for the public interest. ’ ’
Thus it will be seen, the highest judicial authority in the land has laid down the principle that the state, in its sovereign capacity, has power to limit and qualify the ownership which a person may acquire in game, with such conditions and restrictions as it may deem necessary for the public interest, and that there is a fundamental distinction between the OAvnership which one may acquire in game and the perfect nature of OAvnership in other property.
There is another view of the power of the state to enact such legislation as that under consideration, which is equally conclusive. The right to preserve game flows also from the undoubted existence in the state of a police power to that end.
In State v. Rodman, 58 Minn. 393, 400, the supreme court of Minnesota said:
“The preservation of such ■ animals as are *23 adapted to consumption as food, or to any other useful purpose, is a matter of public interest; and it is within the police power of the state, as the representative of the people in their united sovereignty, to make such laws as will best preserve such game, and secure its beneficial use in the future to the citizens, and to that end it may adopt any reasonable regulations, not only as to time and manner in which such game may be taken and killed, but also imposing-limitations upon the right of property in such game after it has been reduced to possession, which limitations deprive no person of his property, because he who takes or kills game had no previous right to property in it, and when he acquires such right by reducing it to possession, he does so subject to such conditions and limitations as the legislature has seen fit to impose.”
In Magner v. People, 97 Ill. 320, the supreme court of Illinois said:
“So far as we are aware, it has never been judicially denied that the government, under its police powers, may make regulations for the preservation of game and fish, restricting their taking and molestation to certain seasons of the year, although laws to this effect, it is believed, have been in force in many of the older states since the organization of the federal government. * * * The ownership being-in the people of the state — the repository of the sovereign authority — -and no individual having any property rights to be affected, it necessarily results that the legislature, as the representative of the people of the state, may withhold or grant to individuals the right to hunt and kill game, or qualify or restrict, as in the opinions of its members, will best subserve the public welfare.”
See also Geer v. Conn., supra.
In ex parte Maier, 103 Cal. 476, after recogniz *24 ing the doctrine that it is within the police power of the state to enact such legislation as may he deemed necessary to protect the game, it is said, page 483:
“The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation or the public good.”
In State v. Snowman, 94 Me. 99, 111, the supreme court says:
‘ ‘ The fish in the waters of the state and the game in its forests belong to the people of the state in their sovereign capacity who, through their representatives the legislature, have sole control thereof and may permit or prohibit their taking.” (Citing a number of cases.)
In Stevens v. State, 89 Md. 669, 674, it is said:
‘ ‘ That the total prohibition of having game, from whatever source derived, in possession during the closed season, is a reasonable, if not necessary, means of protecting the domestic game of the state making the prohibition, has been held in a number of the cases.” (Citing them.)
In addition to the power of the state to enact such legislation, based upon its right in its sovereign capacity, and as an exercise of its police power, the legislature of this state has vested the ownership of game in the state as a proprietor.
The statutes of Colorado and other states vesting the ownership of game in the state as a “proprietor,” take away from the people the right to capture and kill the game, unless prohibited, leaving under these statutes no right, except as permitted. Otherwise expressed, in the absence of statute vesting the ownership in the state, the game was, like the water of *25 the streams, open to the first appropriator, except as prohibited by law, while under statutes vesting the ownership in the state, the game is, like the land and timber of the state, it can be appropriated to use or held in possession only as permitted by law.
It therefore follows that, under the facts of this case, plaintiff’s right to the possession of the deer hides could not be established by showing that possession thereof was not prohibited by law, but it was incumbent upon him to point out some provisions of law which permitted him to have possession, and that a failure upon his part to allege and prove facts which would entitle him to possession under the law would defeat his recovery.
Viewed in the light most favorable to the plaintiff, the evidence in this case ‘shows that, Décember 10, 1900, plaintiff was in the unlawful possession of 300 deer hides, which were taken from his possession by an officer authorized so to do. On the same date, by some sort of a deal with the officer, the merits of which it is unnecessary to discuss, the hides were redelivered to plaintiff. There is no pretense that the redelivery was made pursuant to the terms of the law relating to the sale of game seized by an officer (secs. 10 and 11, Division D, supra), as no “officer’s invoice” was demanded by plaintiff or issued to him. January 28, 1901, plaintiff was again found in the unlawful possession of 300 hides, which he claims were the same hides; whether they were or not is immaterial, and it is also immaterial whether or not the officer acted within his authority in redelivering the hides to plaintiff December 10, 1900, as, even if he did, and the “officer’s invoice” had been issued to plaintiff, by the terms thereof it expired thirty days 'after December 10, 1900, or January 9,1901; so that in any event, under the law, his possession January 28 was unlawful, for the reason that the “officer’s *26 invoice,” provided for by section 10, Division D, above quoted, is essential to the lawful possession of game or any part thereof, acquired by purchase from the officer, and possession of the game or any part thereof, became unlawful thirty days after the date of such invoice.
The testimony did not establish plaintiff’s ownership or right of possession; the motion for judgment and the request for an instruction to that effect, should have been granted.
Every one is presumed to know the law, and persons who acquire such property, take it subject to the provisions of the law. They can acquire no title or right to possession of it unless the same is permitted by the terms of the law, and such title and right of possession is siabject to termination under the provisions of the law.
It is said, there being no statute prohibiting possession of hides lawfully taken, because sections 5 and 6 of the act of 1891, which provide for the “tagging” of hides, and the possession and shipment of the same when “tagged,” had been repealed by the act of 1899, therefore the state had abandoned its right- to the hides.
With this conclusion we do not agree.
By express statutory enactment the provisions of the law with reference to possession, transportation, sale, etc., are made to “extend to and include every part of such game.” — Sec. 18, Division A, supra.
Appellee has not cited a single authority involving a discussion of the principles which control this case.
A number of authorities, in addition to those above quoted, might be cited in support of the principles herein announced, but we forbear, as this opinion is already too extended.
*27 The explicit language of the act of 1899, and an examination of the various changes which the laws relating to the protection of game and fish have undergone at the hands of the legislature, from, the earliest territorial days, is convincing of the intention upon the part of the legislature to do just what this act does by its terms, to wit, entirely prohibit traffic in the game of this state, or any part thereof, no matter uhen hilled, unless expressly permitted by law, and it need hardly be suggested that such a provision, if enforced, will tend greatly to the attainment of the object sought.
The facility and ease with which laws for the protection of game have been evaded in the past is matter of common knowledge. As counsel for appellant well state in their brief:
“With the possible exception of the mountain' lion, the coyote and the wolf, the most persistent and heartless enemies of the game, and at the same time the most difficult to detect and punish, are the meat and hide hunters and buyers. If, with the law declaring the limit in possession for one person to be two horned deer (or any part thereof), and that in the open season only, a man can successfully get away with 300 hides of all sexes and ages in the close season, then game laws are ineffectual, and the game department had as well be abolished. ’ ’
These and like considerations no doubt actuated the legislature in the premises, and induced the enactment of the statute in its present form, to meet just such cases as this record presents.
We know of no reason why the statute should not be held to mean what it says; the language is clear and free of ambiguity; in such case there is no room for construction, arid we are not at liberty to place a limitation upon the meaning or intent of the *28 legislature, which its language will not clearly support.
In the view which we take of the law, it will bo impossible for appellee to establish Ms right to the possession of the property in controversy herein.
The judgment will be reversed, and the cause remanded with instructions to the court below to dismiss the action. ° Reversed.