[No. 12310.   Department Two.   December 17, 1914.]

# C. C. Cawsey *et al.*, *Appellants*, v. W. L. Brickey *et al.*, *Respondents.*[1]

Statutes—Title and Subjects—Scope.   The title to a game code, indicating its broad scope as a complete code regulating the protection and taking of game birds and fish is sufficient to embrace as germane thereto, 3 Rem. & Bal. Code, § 5395-4, authorizing county game commissioners to set aside limited game preserves wherein game shall not be taken within such time as they may fix.

Game—Title to—Constitutional Law—Vested Rights—Police Power.   There being no private right in the citizen to take game, the title being in the state, the state's right to control or prohibit the taking of game is an inherent incident of the police power; and 3 Rem. & Bal. Code, § 5395-21, to the above effect, is but declaratory of the common law, and therefore does not deprive any one of property rights or vested privileges.

Constitutional Law — Class Legislation — Creation of Game Preserves.   3 Rem. & Bal. Code, § 5395-4, providing that the county game commission shall have power to set aside limited game preserves wherein no game bird, animal, or fish can be taken or killed within such times as the commission shall determine, is not unconstitutional as class legislation in that it bears unequally upon persons smilarly situated, since a person having land peculiarly suited for game preserves occupies a different relation to the purpose of the law from others whose lands are not so suited, and the law operates equally on all persons similarly situated.

Constitutional Law—Legislative Powers—Delegation.   3 Rem. & Bal. Code, § 5395-4, providing that the county game commission shall have power to set aside limited game preserves wherein no game bird, animal or fish can be taken or killed within such times as the commission shall determine, is not unconstitutional as an unlawful delegation of legislative power, since the law is a complete law in itself delegating the making of no substantive law, but only the power to determine a fact or condition upon which it shall operate.

Constitutional Law—Police Power—Reasonableness.   3 Rem. & Bal. Code, § 5395-4, providing that the county game commission shall have power to set aside limited game preserves wherein no game bird, animal or fish can be taken or killed within such times as the commission shall determine, is not unconstitutional as grant-

[1]Reported in 144 Pac. 938.

ing such an arbitrary and unlimited power as to be an unreasonable exercise of the police power; since reasonably construed to bring about a construction compatible with the obvious purpose of the legislature—the protection, propagation and restoration of game— the power to set aside lands as a game preserve necessarily implies not an arbitrary selection, but one peculiarly suitable for the purpose, which furnishes a guide and marks a limit to the discretion vested in the commission.

GAME—GAME PRESERVES—ESTABLISHMENT—DISCRETION—ABUSE— EVIDENCE—SUFFICIENCY. The evidence is insufficient to show that the game commission of S. county acted arbitrarily in setting aside as a game preserve the lands owned or leased by a gun club, influenced thereto, as alleged, by the fact that members of the gun club had refused to comply with an order of the commission to desist from "feeding" their grounds prior to the opening of the season, which order was without authority and was rescinded, where every member of the commission testified that he was not influenced by the matter of "feeding," and it clearly appears that this land was selected only after a thorough investigation, and many testified that it was better adapted for a refuge, nesting, and breeding place for birds than any other tract in the county, and that many varieties breed and nest there.

Appeal from a judgment of the superior court for Skagit county, Houser, J., entered June 17, 1914, upon findings in favor of the defendants, dismissing an action for an injunction. Affirmed.

*E. C. Million* and *Kerr & McCord*, for appellants.

*Thomas Smith*, *W. L. Brickey*, and *C. D. Beagle*, for respondent.

ELLIS, J.—Action to enjoin the enforcement of an order creating a game preserve in Skagit county. The plaintiffs constitute a gun club, and have leased, for a term of years, certain lands as a shooting preserve, including lands of the interveners, and have, for a long time, maintained thereon a gun club and have expended considerable sums in equipment. The defendants are the sheriff, prosecuting attorney, game warden and the three members of the game commission, of Skagit county, appointed under the game code, chapter 120, Laws of 1913, p. 356 *et seq.* (3 Rem. & Bal. Code,

§ 5395-1 *et seq.*). Acting under section 4 of that law, the game commission selected certain lands as a game preserve and including the lands covered by the plaintiffs' lease as well as those owned by the interveners. The injunction was denied. The plaintiffs and interveners have appealed.

The appellants attack the law of 1913 and particularly subdivision 7, of § 4 (Id., § 5395-4), claiming that it is unconstitutional, (1) because the title of the act is insufficient to cover the provisions of that subdivision; (2) because that subdivision deprives the appellants of valuable property rights and privileges without due process of law, bears unequally on different persons and communities and is class legislation; (3) because that subdivision is a delegation of legislative powers; (4) because it grants arbitrary and unlimited powers to the commission. It is also claimed that these powers were here arbitrarily exercised. We shall consider these in their order.

I.   The title of the act, so far as here material, is as follows:

"An act relating to the protection, propagation, introduction, purchase, and restoration of game birds, game animals, and game fish, creating a chief game warden and a chief deputy game warden, county game commissioners, creating the office of county game wardens, relating to licenses for hunting and fishing, fixing the season for the taking, regulating the transportation and possession of game animals, game birds and game fish."

The mention of a given subject in the title is notice of all things germane to that subject found in the act. The title being intended to call attention to the subject-matter of the act, need not be an index to the contents of the act. It is sufficient if it gives notice of the general scope and purpose of the act. We have so held in a multitude of cases. See, *State ex rel. Lindsey v. Derbyshire,* 79 Wash. 227, 140 Pac. 540, and cases there cited. The title here in question indicates the broad scope of the act as a complete game code relating to the protection, propagation, introduction, pur-

chase and restoration of game birds, game animals and game fish. The creation of game preserves, such as authorized in subd. 7 of § 4, being clearly an appropriate provision to the carrying out of the general purpose outlined in the title, it is clearly germane thereto and is covered by the title.

II. Subdivision 7, § 4 of the act, reads as follows:

"The county game commission in their respective counties shall have the power and authority by giving notice thereof by publication for three successive weeks in a newspaper published at the county seat of such county describing such lands to be set aside as a game preserve, to set aside certain parts or portions of their respective counties as game preserves wherein no game bird or game animal or game fish can be caught or killed within the boundaries thereof, for such time and so long as they may see fit and proper: Providing, however, That no game preserve or preserves so set aside by said county game commission shall consist of more than three (3) townships in any one county." Laws 1913, p. 358 (3 Rem. & Bal. Code, § 5395-4).

Do these provisions tend to deprive any one of property rights or vested privileges? We think not. Under the common law of England all property right in animals *ferae naturae* was in the sovereign for the use and benefit of the people. The killing, taking and use of game was subject to absolute governmental control for the common good. This absolute power to control and regulate was vested in the colonial governments as a part of the common law. It passed with the title to game to the several states as an incident of their sovereignty and was retained by the states for the use and benefit of the people of the states, subject only to any applicable provisions of the Federal constitution. *Geer v. Connecticut*, 161 U. S. 519, 527, 528; *Harper v. Galloway*, 58 Fla. 255, 51 South. 226, 26 L. R. A. (N. S.) 794; *State v. Snowman*, 94 Me. 99, 46 Atl. 815, 80 Am. St. 380, 50 L. R. A. 544; *Smith v. State*, 55 Ind. 611, 58 N. E. 1044, 51 L. R. A. 404; *Ex parte Maier*, 103 Cal. 476, 37 Pac. 402; *Magner v. People*, 97 Ill. 320; *State v. Hume*, 52 Ore. 1,

95 Pac. 808; *Sherwood v. Stephens,* 13 Idaho 399, 90 Pac.
345; *Hornbeke v. White,* 20 Colo. App. 13, 76 Pac. 926;
Freund, Police Power, § 418.  There is no private right in
the citizen to take fish or game, except as either expressly
given or inferentially suffered by the state.  *State v. Tice,*
69 Wash. 403, 125 Pac. 168, 41 L. R. A. (N. S.) 469.  Sec-
tion 21 of the game code provides:

"No person shall at any time or in any manner acquire
any property in, or subject to his dominion or control, any
of the game birds, game animals, or game fish, or any parts
thereof, of the game birds, game animals or game fish herein
mentioned, but they shall always and under all circumstances
be and remain the property of the state."  Laws 1913, p.
365 (3 Rem. & Bal. Code, § 5395-21.)

This is but declaratory of the common law.  Whatever
special or qualified rights or, more correctly speaking, privi-
leges, a land owner may have as to game, while it is on his
own land, though protected by the laws of trespass as against
other persons, have no protection, because they have no ex-
istence, as against the state.  Since the title to game is in
the state for the common good, the state's right to control,
regulate or prohibit the taking of game wheresoever found
and on whosesoever land is an inherent incident of the police
power of the state.  Tiedeman's Limitations of Police Power,
§ 121f.  It may be exercised *ad libitum* so long as the regu-
lation or prohibition bears equally on all persons similarly
situated with reference to the subject-matter and purpose to
be served by the regulation.  *Portland Fish Co. v. Benson,*
56 Ore. 147, 108 Pac. 122.

Does the act here in question bear unequally on persons
similarly situated so as to be obnoxious to the constitutional
inhibition against class legislation?  We think not.  It is
the universality of the operation of a law on all persons of
the state similarly situated with reference to the subject-
matter that determines its validity as a general and uniform
law, not the extent of territory in which it operates.  That

its operation may not be at all times coextensive with the territorial limits of the state, is usually an immaterial circumstance. *State ex rel. Lindsey v. Derbyshire*, 79 Wash. 227, 140 Pac. 540. The owner of land which, from its location and character, is peculiarly suited for a game preserve is not situated similarly to other land owners with reference to the subject-matter and purpose of a law creating a preserve. The subject-matter and purpose is protection and preservation of game. It is so declared in the title of the act. One whose land is thus peculiarly suited to meet those purposes obviously occupies a different relation to the purpose of the law from that occupied by one whose land is not so suited. When, therefore, the state authorizes the setting apart of his land for a game preserve, and deprives him and all others of the privilege of taking game thereon, the law operates equally on all persons similarly situated and is a proper exercise of the police power.

In this phase, the case here is not distinguishable from *Hayes v. Territory*, 2 Wash. Terr. 286, 5 Pac. 927. A territorial law restricted hunting in only five counties. Obviously owners of land in those counties were subjected to restricted hunting on their own land, while owners of land in other counties could hunt on their own land without restriction. The law was assailed as invalid on the ground that it granted special privileges. The territorial supreme court through Greene, C. J., tersely and soundly disposed of the question as follows:

"The game law in question restricted hunting in five counties only. It is contended that, for this reason, it is inconsistent with that inhibition in the Organic Act which forbids the Legislature from granting special privileges. But the provisions of this game law fall without distinction upon all inhabitants of the Territory. All are forbidden to hunt at certain seasons within the counties named. There is no special privilege, unless it be in favor of the brute life of the specified area, or those of human kind who are so happy as to be alive at the hunting season."

In both the *Hayes* case and this case, the circumscribed geographical operation of the law makes the difference in the relation of those owning land within and those owning land without the circumscribed area. Barring this difference, the law is absolutely uniform in its operation on all persons. No one can hunt or take game or fish within that area.

The case of *Harper v. Galloway, supra,* which is more nearly apposite than any other case cited by appellants, is not a parallel to the case here. It presents the antithesis of this and the case of *Hayes v. Territory, supra.* The law of the state of Florida there involved regulated the taking of game in a single county. It required residents of the state, but not of that county, to give three days' notice to the game warden and pay a special license tax in order to be permitted to hunt in that county. Neither notice nor license tax was required of residents of that county. Obviously since the game of the state belongs to the state for the benefit of all the people of the state, the requirement of a notice and license tax from other citizens but not from residents of the county was an unreasonable and unjust discrimination. It imposed a burden upon some of the residents of the state not put upon other residents of the state with reference to the subject regulated though all stood in the same relation to the subject regulated barring the immaterial incident of geographical location. The court clearly recognized that fact as the basis of its decision. We hold that the section complained of deprives the appellants of no property right, bears equally upon all persons similarly situated, and is not void as class legislation.

III. Is the authority conferred upon the county game commission to select and set apart lands of the county as a game preserve an unlawful delegation of the legislative function? We think not. It seems to us a conclusive answer to this question to say that the law was a complete law in all of its parts when it left the hands of the legislature. It delegates the making of no substantive law. All the substantive

provisions of the law are supplied by the act itself. It merely declares, as a part of the law itself, a condition upon which it shall operate. Neither the law nor any part of it springs from the action of the local game commission. All that the law refers to the commission are questions of fact as to the expediency of its local operation. In this aspect it is certainly no more invalid than local option laws, touching the sale of intoxicating liquors, which are now almost universally held constitutional. Cooley's Constitutional Limitations (7th ed.), p. 174.

This same objection was raised to an act of Congress authorizing the Secretary of War to make such rules and regulations as might be necessary to protect improvements on the Mississippi river and providing that any violation of such rules shall constitute a misdemeanor. Sustaining the law as valid the Federal circuit court, speaking through Lamar, Justice, said:

"If the law empowered the secretary of war, by rule or regulation, to make a certain act criminal, and punishable as such, then this prosecution would not be maintainable; but it is not the rule and regulation which declares the violation thereof a crime, and punishable. All that the secretary is authorized to do is to make the rule and regulation. It is the act of congress which declares that the unlawful and willful violation of such rule and regulation, after it is promulgated, shall be held a misdemeanor by the person violating the same, . . . Numerous acts of congress have been passed authorizing the postmaster general, and other members of the executive department, to make rules and regulations for the business pertaining to their respective departments, and declaring that, when made and promulgated, a willful and unlawful violation of them should be held a crime against the United States, and the violators punished as prescribed in the act. . . . Numerous decisions made by the supreme court of the United States might be cited to maintain the position stated, but they are so well known to the profession that reference to them is deemed unnecessary." *United States v. Breen*, 40 Fed. 402.

In the recent case of *Carstens v. DeSellem, ante* p. 643, 144 Pac. 934, the horticultural law of 1909 was involved. Laws 1909, p. 495 (Rem. & Bal. Code, § 3069; P. C. 231 § 1). That law provides that the diseases to which its provisions for the destruction of infected or diseased trees shall apply, shall include any and all such diseases or pests as the state commissioner of horticulture shall specify and describe in the bulletins to be issued by him, as injurious to the fruit and horticultural interests of the state. It is obvious that by publishing a new bulletin the commissioner may extend the law to additional diseases or pests or withdraw its operation as to those formerly included. The law was assailed as vesting legislative power in the commissioner. Overruling this contention we said:

"In the light of the act, we think the duties imposed upon the commissioner are administrative and not legislative."

This decision clearly meets every objection raised by the appellants to the law here in question, both as to the power of the commission to put the law into operation or withhold it from operation in a given county.

This court answering the same contention here advanced touching the herd law of 1907 (Laws 1907, p. 566, ch. 230), making it a misdemeanor to permit live stock to roam at large in counties where three-fourths of the land is under fence and providing that ten freeholders and the board of county commissioners shall determine the fact as to three-fourths of the land being under fence, said:

"The act was passed by the legislature. That authority may say definitely when an act shall take effect; or it may fix an indefinite time in the future upon the happening of some event before the act shall take effect. Cooley, Const. Lim. (7th ed.), p. 169. The mere fact that the act does not take effect until the contingency arises, does not indicate a delegation of legislative power, even where the contingency depends upon the action of certain persons." *State v. Storey,* 51 Wash. 630, 99 Pac. 878.

The distinction between the making of a law and the determination of the facts upon which the law itself makes its operation depend is also clearly recognized and elaborately discussed and illuminated by the supreme court of the United States in *Field v. Clark*, 143 U. S. 649, 693, 694. There, touching the power conferred by congress upon the president to suspend the free importation of certain commodities from countries not reciprocating, the court said:

"What the president was required to do was simply in execution of the act of Congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect. It was a part of the law itself as it left the hands of Congress that the provisions, full and complete in themselves, permitting the free introduction of sugars, molasses, coffee, tea and hides, from particular countries, should be suspended, in a given contingency, and that in case of such suspensions certain duties should be imposed.

" 'The true distinction,' as Judge Ranney, speaking for the supreme court of Ohio, has well said, 'is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' *Cincinnati, Wilmington etc. Railroad v. Commissioners*, 1 Ohio St. 88."

The true rule is thus clearly expressed by the supreme court of Pennsylvania:

"Then, the true distinction, I conceive, is this: The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation." *Locke's Appeal*, 72 Pa. St. 491, 498, 13 Am. Rep. 716.

See, also, *Moers v. City of Reading*, 21 Pa. St. 188, 202.

In *Dowling v. Lancashire Ins. Co.*, 92 Wis. 63, 65 N. W. 738, 31 L. R. A. 112, a decision copiously quoted by the appellants as sustaining their claim, there was an attempt to delegate to the insurance commissioner the power to determine, in effect, the provisions and conditions requisite to a valid insurance policy. This the court held was nothing more nor less than the delegation of the power to declare substantive law. The act was held invalid. If we grant its soundness, the decision nevertheless marks the real ground of distinction between that law and the one here under consideration, quoting with approval the rule announced by the supreme court of Pennsylvania in *Locke's Appeal* above quoted.

The case of *Noel v. People*, 187 Ill. 587, 58 N. E. 616, 79 Am. St. 238, 52 L. R. A. 287, is also readily distinguished. The law there in question, vested the board of pharmacy with the absolute power to say what persons or firms should sell domestic remedies in villages and localities and just what they should be allowed to sell. This was held an illegal delegation of legislative functions. It was also held to authorize an unjust discrimination between persons of the same class in that it might be exercised in the interests of the favored few. The law here is open to no such objection. The selection of the game preserve is made in the interests of all and operates alike upon all to the same extent as if made directly by the legislature. The commission can permit no man to hunt where another may not hunt. No one's property is taken nor his right to pursue any legal business or calling interfered with. Lack of space permits a review of the other authorities cited by the appellants. They are all readily distinguishable from the case in hand.

IV. Does § 4 of the act (3 Rem. & Bal. Code, § 5395-4) grant such arbitrary and unlimited power to the game commission as to render it unconstitutional and void as an unreasonable exercise of the police power? Reasonably construed, we think not. No court should place upon a law a

construction so extreme and violent as to bring about an unconstitutional result when the law is capable of a reasonable construction compatible with the obvious purpose of the legislature in passing the act, and which would not have that result. *Forestier v. Johnson,* 164 Cal. 24, 127 Pac. 156. The declared purpose of the act is the protection, propagation and restoration of game, etc. The powers conferred upon the game commission must be construed with reference to that purpose. The power to set aside lands as a game preserve necessarily implies not an arbitrary selection, but a selection of lands peculiarly suitable for that purpose. The act reasonably construed gives no power to select any other lands. True it gives the commission a discretion, but the whole purpose of the act furnishes a guide and marks a limit to that discretion which excludes the right to act arbitrarily. *State ex rel. Oregon R. & Nav. Co. v. Railroad Commission,* 52 Wash. 17, 100 Pac. 179. It is also true that any discretionary power may be abused, but an abuse will not be assumed in the absence of clear and convincing evidence. Every reasonable presumption will be indulged in favor of the regularity and good faith of official action. *Tainter v. Lucas,* 29 Wis. 375; *Quigley v. Phelps,* 74 Wash. 73, 132 Pac. 738.

The appellants' evidence tended to show that the game commission was influenced by a refusal of the appellants to observe an order of the commission to desist from the practice of "feeding" their grounds prior to and during the hunting season to entice game there for the purpose of killing. It is admitted that the commission had no authority to make the order, and the evidence shows it was revoked at the request of a member of the gun club. If, however, the custom of feeding grounds contributed, as some of the evidence tended to show, to an excessive slaughter of game, that circumstance was a proper one to consider in determining the local necessity for a public preserve. Every member of the commission testified that he was not influenced in the selec-

tion of this land by any feeling of animosity toward the appellants. One of the commissioners was a member of a game club the shooting grounds of which were included in the preserve. We shall not review in detail the conflicting evidence as to the peculiar suitability of the land selected for a game preserve. It will suffice to say that it clearly appears that the commission selected this land only after a thorough investigation, and that many witnesses testified that it is better adapted for a refuge, nesting, and breeding place for birds than any other tract in Skagit county, and that many varieties do nest and breed there. We fail to find sufficient evidence of arbitrary action to warrant an interference with the order creating the preserve.

The judgment is affirmed.

CROW, C. J., MOUNT, MAIN, and FULLERTON, JJ., concur.