THE STATE OF WASHINGTON, *on the Relation of Daniel Campbell, Plaintiff*, v. OTTO A. CASE, *as State Treasurer, et al., Respondents.*[1]

[1]Reported in 47 P. (2d) 24.

*W. H. Abbott, Ralph O. Olson,* and *Kerr, McCord & Carey,* for relator.

*The Attorney General* and *George Downer, Assistant,* for respondents.

GERAGHTY, J.—This is an original application in this court for a writ of mandate requiring the issuance to the relator, pursuant to his application therefor filed with the state treasurer, of renewals for the year 1935 of certain pound net licenses. Three other cases—Nos. 25627, 25628 and 25629—involving substantially the same state of facts, are pending in this court, and the parties therein have stipulated that our decision in this case will control and determine those cases.

The essential facts, as they appear in relator's affidavit and admitted by the respondents, are, in brief: Relator, a citizen of the United States, of lawful age, and a resident of the state for many years past, was, on April 2, 1934, the owner of two pound net, or fish trap, locations situated in the Puget Sound district in this state, held under pound net licenses issued to him by the director of licenses of the state; these annual licenses having been issued to him in renewal of like licenses issued April 1, 1933. These pound net locations have a value in excess of twenty thousand dollars, and all requirements of existing law necessary to their retention by relator have been complied with; that each location is valuable for the purpose of taking food fish other than salmon. Relator has on hand, for the construction of pound nets on these two locations, equipment of the reasonable value of ten thousand dollars. The operation of these fishing appliances re-

quires the use of a large amount of capital and the employment of much labor.

It is alleged that the annual personal property tax of these locations and equipment represents a substantial part of the tax revenue to the county in which they are situated, and that personal property taxes annually levied upon and collected from relator and other owners of fish traps in the northwest counties of the state, represent a material item in the tax revenues of such counties.

Relator made his application for the renewal of the licenses, accompanied by the proper fees, but the respondents have refused to issue the licenses to him, on the sole ground that initiative No. 77 (Chapter 1, Laws of 1935, p. 3) [Rem. 1935 Sup., § 5671-1 *et seq.*], prohibits the operation of pound nets or fish traps within the waters of the state. Relator is desirous of constructing, and will, if licenses are issued to him pursuant to his application, construct pound nets on his locations and operate them during the current season; and, if licenses are denied him, his locations and equipment will be rendered valueless.

Section 1 of the act makes it unlawful to fish for, catch or take any species of salmon, salmon trout, trout or steel head by any means other than hook and line, except as thereafter in the act provided, within certain waters lying southerly, easterly and southeasterly of a line defined therein.

Section 2 of the act provides that no area theretofore or thereafter set apart as a salmon preserve by the state shall, by any provisions of the act, be opened to commercial fishing.

Section 3 permits commercial trolling for salmon, with no more than six hooks to one boat, in the area prescribed in § 1, during the seasons and subject to

the regulations prescribed from time to time by the state department of fisheries.

Section 4 provides that any person, firm or corporation who shall have held, in either of the years 1932 or 1933, a license from the director of licenses of the state for the operation of a gill net within the waters of Puget Sound, may be licensed to operate the gill net for the purpose of catching salmon only according to the regulations of the fisheries department of the state for gill nets for the year 1933, within the waters described in the first section of the act, for each succeeding year after its effective date, by making application to the director of licenses and paying to the state treasurer the fee prescribed; and no other person, firm or corporation shall be licensed hereafter to operate a gill net in the waters described in the first section. Licenses issued under this section are to be personal and not transferable, either voluntarily or involuntarily, or by operation of law. This section is qualified by a proviso that, if for any reason any of its provisions shall be held to be unconstitutional, no license shall issue to any person, firm or corporation for the operation of a gill net within any of the waters described in the first section, except as permitted by the fisheries department under existing law.

Section 5 permits commercial fishing in the area described in § 1 during certain defined periods, with a proviso that no fisherman shall employ any of the appliances inhibited by § 8 of the act, nor any gill net except as permitted by § 4.

Section 6 prohibits gill nets in the Columbia river exceeding two hundred and fifty fathoms in length; section 7 prohibits the use of drag seines in that river.

Sections 8 and 9 are as follows:

"SEC. 8. It shall be unlawful to construct, install, use, operate, or maintain, within any of the waters of the State of Washington, any pound net, fish trap,

fish wheel, scow fish wheel, set net, weir, or any fixed appliance for the purpose of catching salmon, salmon trout, or steel head, or to take salmon, salmon trout, or steel head by any such means.

"SEC. 9. The provisions of this Act do not apply to fishing by Indians under Federal regulation, or the use of any device or means by the state or national government in catching fish for propagation or scientific purposes."

Section 10 provides penalties for the violation of the act.

Section 11 is a saving clause and provides that, if any section or provision of the act shall be held unconstitutional or otherwise invalid, such invalidity shall not affect the validity of the act as a whole, or of any section, provision or part not adjudged to be invalid or unconstitutional.

Finally, the act repeals all acts and parts of acts in conflict with its provisions.

Relator's first and principal challenge to the act is that it exempts from its provisions a class of citizens, namely, Indians under Federal regulation, in violation of § 12 of Art. I of the state constitution and of the equal protection clause of the fourteenth amendment to the constitution of the United States. This contention is based upon the fact that, by the congressional act of June 2, 1924, Chapter 233, 43 Stat. 253, Title 8, U. S. C. A., § 3, all Indians born within the territorial limits of the United States are declared to be citizens of the United States; and being citizens of the United States, Indian residents of the state are citizens thereof by virtue of the fourteenth amendment. Therefore, by this exemption, a considerable body of citizens of Indian blood are granted privileges and immunities denied to other citizens of the state.

As to the source of the state's power in the control

and regulation of the taking of fish in its territorial waters, we said, in *McMillan v. Sims*, 132 Wash. 265, 231 Pac. 943:

"Let us at the outset be reminded that in the regulation of and restrictions upon the taking of the fish from the waters of the state, the state is but dealing with its own property over which its control is as absolute as any other owner has over his property. In *State v. Tice*, 69 Wash. 403, 125 Pac. 168, 49 L. R. A. (N. S.) 469, we said:

" 'The decisions of the courts in this country, so far as they have come to our notice, are all in unison in holding that there is no private right in the citizen to take fish or game, except as such right is either expressly or inferentially given by the state.' "

But while the state owns the fish in its waters in its proprietary right, it holds title as trustee for all the people and for the common good, and regulations made for the use of this common property must bear equally on all persons similarly situated. *Cawsey v. Brickey*, 82 Wash. 653, 144 Pac. 938. It therefore follows that, if the act does, in fact, as contended by the relator, grant a special exemption to a body of citizens of the state, denied to all other citizens, it thereby contravenes the cited section of the constitution. The pertinent part of § 9 reads: "The provisions of this act do not apply to fishing by Indians under Federal regulation, . . ."

The solution of our problem is dependent upon the construction of the language of this clause. The relator contends that the phrase "under Federal regulation" qualifies "Indians;" while the respondents argue that the phrase qualifies the word "fishing." There are accepted canons of construction for determining the meaning of doubtful language, but these canons are not inflexible in their use. Their application in particular provisions may be qualified. In 2

Lewis' Sutherland, Statutory Construction (2d Ed.), § 420, it is said:

"Relative and qualifying words and phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent."

But in the same section, it is said:

"This principle is of no great force; it is only operative when there is nothing in the statute indicating that the relative word or qualifying provision is intended to have a different effect. And very slight indication of legislative purpose or a parity of reason, or the natural and common-sense reading of the statute, may overturn it and give it a more comprehensive application."

In construing the language used in this exemption, we are to bear in mind the purposes sought to be accomplished by the act, as we gather them from its general tenor. The act is for the regulation of commercial fishing for salmon, prescribing conditions that will tend to conserve this type of food fish, and to that end forbids the use of certain fixed appliances for salmon fishing in all waters of the state. It has other regulations applicable only to part of the state's waters. It relates to the instrumentalities by which, and the seasons and the places in which, salmon fishing is to be carried on. The law is comprehensive in its application. Reading into such a law a purpose to exempt a class of citizens from the restrictions placed upon all other citizens, can only be justified by language unmistakably indicating a purpose to grant the exemption.

Now considering the language of the exemption in the light of the purpose of the act as it is disclosed by its terms, we think the relative and qualifying phrase "under Federal regulation" refers to the phrase "fishing by Indians" as its antecedent, rather than to the single word "Indians," as contended by the rela-

tor. As we read the exemption, its manifest purpose is to save to the Indians, generally, using the term "Indians" in its historic sense, whatever rights they may yet retain to fish, under Federal regulation, in the waters of the state. Those who drafted the act and the people who voted for it doubtless had in mind the controversies existing between the Indians and the civil authorities throughout the history of our territory and state—controversies growing out of the right to fish reserved to Indians by early tribal treaties with the Federal government, rights to fish granted as appurtenant to their reservations, and rights within the reservations. Having these controversies in mind, the exemption clause could well have been inserted out of an abundance of caution, to save to the Indians whatever rights they possessed by reason of their peculiar and special relation to the Federal government, past and present, be those rights much or little.

It is a well settled rule that, where a statute is open to two constructions, one of which will render it constitutional, and the other unconstitutional, the former construction, and not the latter, is to be adopted. *Poolman v. Langdon,* 94 Wash. 448, 162 Pac. 578.

"Furthermore, we must remember in considering an act of Congress that a construction which might render it unconstitutional is to be avoided. We said in *United States v. Jin Fuey Moy,* 241 U. S. 394, 401: 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.' " *United States v. Standard Brewery,* 251 U. S. 210, 40 Sup. Ct. 139.

The relator next contends that, even though the act be held constitutional, he is, nevertheless, entitled to a renewal of his licenses under existing law; first, because he has a property right in his pound net locations which the act does not purport to deprive him

of, and secondly, because he has the right to operate his pound nets at the locations heretofore held by him for the purpose of catching fish other than salmon. To sustain his contention, relator must find support for it in the laws of the state.

Rem. Rev. Stat., § 5671 [P. C. § 2428] reads:

"The use of pound-nets, traps, traps fished at both ends of lead, fish-wheels and other fixed appliances, purse-nets, drag-seines and other seines, *for catching salmon* and the use of set-nets and gill-nets is hereby authorized in all the waters of this state, except as prohibited by this act." (Italics ours.)

This is the only provision in the statute affirmatively authorizing the installation and use of pound nets and other fixed appliances in taking fish.

Rem. Rev. Stat., § 5703 [P. C. § 2460], provides for the manner of issuing licenses and fixes a schedule of fees to be paid therefor. In fixing the fees for pound net and fish trap licenses, the following language is used:

"For each pound-net or fish trap license for taking salmon on Puget Sound, fifty dollars ($50.00);

"For each pound-net or fish-trap license for the taking of salmon, on the Columbia River, twenty-five dollars ($25.00);

"For each second-class pound-net or fish-trap license, fifteen dollars ($15.00);

"(A first-class trap is hereby defined to be a trap on the Columbia River that during the preceding season caught fish of the value of one thousand dollars or more, and a second-class trap, a trap on the Columbia River that caught during the preceding season fish of the value of less than one thousand dollars ($1,000.00);

"For each pound-net or fish-trap license for the taking of salmon in Willapa and Grays Harbor, fifteen dollars ($15.00); . . . "

We do not find, in the lengthy schedule of license fees set out in this section, any provision for the payment of fees for pound nets or fish traps for catching fish other than salmon. There are other sections of the statute, cited by relator, in his brief, of a negative character, none of them, however, embodying any affirmative authority for the erection of pound nets and traps for catching food fish. The sections cited by relator restrict the broad authority granted in § 5671 [P. C. § 2428], but, as we read them, nowhere affirmatively grant any right for the maintenance of fixed appliances for catching fish other than salmon. Section 5672 [P. C. § 2429] declares that it shall be unlawful to construct fixed appliances for the purpose of catching salmon or other food fish within any river or stream. Section 5688 [P. C. § 2445] makes it unlawful to use any fixed appliances for catching salmon or other food fish with mesh under three inches, stretch measure. Section 5706 [P. C. § 2462] provides that every fixed appliance for taking food fish shall display the license number under which it is operated. Section 5711 [P. C. § 2467] defines the word "fishing" to mean the catching and taking of food fish with any appliance, gear or trap whatsoever. Section 5716 [P. C. § 2473] makes it unlawful to take from any fixed appliance or net any caught or impounded fish with the intent of depriving the owner of the fish.

From these references, the relator seeks to deduce a legislative purpose to grant licenses for locations for pound nets and other appliances for the catching of food fish other than salmon. This is not the construction placed upon the fishing code by the state departments concerned, and it does not appear from the record that any pound net or trap licenses, other than for salmon, have been granted. The licenses under

which the relator is claiming were issued for catching salmon, and are in the following form:

"LICENSE                     No. 143.
"STATE OF WASHINGTON—DEPARTMENT OF LICENSES.
                "Olympia, Washington, April 2, 1934.
"I HEREBY CERTIFY, That Daniel Campbell, of S. Bellingham, Washington, has paid me the License Fee of $50.00 required by law, and is entitled and is hereby licensed, pursuant to the provisions of the law, to fish with PN for salmon at all lawful times and in all lawful ways in Puget Sound district, State of Washington, during the fiscal year ending March 31, 1935. Renewal of No. 143."

We are unable to agree with relator's contention under this head. The pound net licenses which he has heretofore held are for the catching of salmon only, and as we read the statutes, this is the only license that could have been granted to him.

▇ Relator argues that his trap locations will be of great value to him in the event the act is hereafter repealed, or modified in a manner permitting the operation of fish traps. Having made his application for the renewal of his licenses and tendered the state treasurer the proper fees, if the law should hereafter be repealed, or modified in the manner he suggests, he will have available to him whatever preference rights his applications and tender of fees at this time may entitle him to, the extent of which, however, we are not now passing upon.

▇ We will consider relator's next two contentions together. They are: (1) The alleged conflict between the act and the compact between the states of Washington and Oregon in relation to fishing in the Columbia River (40 Stat. 515; Rem. Rev. Stat., § 5770[P. C. § 2525]); and (2) that § 4 discriminates in favor of those who had gill nets in either of the years 1932 or 1933, by reserving to them exclusively hereafter the

right to fish with gill nets in the area described in § 1 of the act.

The relator is seeking a writ directing the respondents, as state officers, to issue to him a renewal of two pound net licenses heretofore held by him upon two locations in San Juan county in Puget Sound. Neither in this case nor in the other three cases depending upon our decision herein, is there any right claimed to fish in the Columbia river. Whether or not the act before us impinges upon the joint compact between the states of Washington and Oregon is a question that cannot affect the claimed rights of the relator to fish with pound nets in the waters of Puget Sound.

So, too, we are unable to see how the relator's rights are in any way affected by § 4 of the act. It appears that the pound net locations claimed by the relator are without this described area, but even if they were within it, the result would be the same; he has not applied for, or been refused, a license to use gill nets.

"The appellant urges the unconstitutionality of the other provisions of the law to render the entire act void. We conceive it to be the unquestioned rule that a person cannot invoke a constitutional objection to a part of a statute not applicable to his own particular case. *Southern R. Co. v. King,* 217 U. S. 524; *Engel v. O'Malley,* 219 U. S. 128; *Standard Stock Food Co. v. Wright,* 225 U. S. 540; *Rosenthal v. People of New York,* 226 U. S. 260; *Darnell v. Indiana,* 226 U. S. 390; *Cram v. Chicago, B. & Q. R. Co.,* 85 Neb. 586, 123 N. W. 1045, 26 L. R. A. (N. S.) 1028; *Wadin v. Czuczka* (Ariz.), 146 Pac. 491. Unless a person's rights are directly involved, courts will postpone inquiry into constitutional questions which are separable therefrom until they are met upon a question directly at issue, unless the unconstitutional feature of it, if it exists, is of such a character as to render the entire act void. (Citing cases.)" *State v. Bowen & Co.,* 86 Wash. 23, 149 Pac. 330, Ann. Cas. 1917B, 625.

The relator next contends that the act is unconstitutional as being an arbitrary, unreasonable and whimsical exercise of the police power of the state, depriving him of his property without due process of law. Relator's argument under this head is devoted largely to questions of policy and the economic importance of the salmon industry in this state. These issues are for the legislative authority of the state to determine, and doubtless were brought to the attention of the electors of the state in the canvass preceding the adoption of initiative No. 77. We cannot assume to revise their judgment upon these questions of policy and expediency.

The charge that the act arbitrarily, unreasonably and whimsically deprives relator of his property rights without due process of law is largely answered by what we have heretofore said. We quote, however, from a few of the many cases in which the extent of the state's control over its fish and game resources is discussed.

The supreme court of the United States, in *Geer v. Connecticut*, 161 U. S. 519, 16 S. Ct. 600, quotes with approval, as follows, from *Magner v. People*, 97 Ill. 320, 333:

" 'So far as we are aware, it has never been judicially denied that the government under its police powers may make regulations for the preservation of game and fish, restricting their taking and molestation to certain seasons of the year, although laws to this effect, it is believed, have been in force in many of the older states since the organization of the Federal Government. . . . The ownership being in the people of the state, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the legislature, as the representative of the people of the State, may withhold or grant to individuals the right to hunt and kill game or qualify or restrict, as in the opinions of its members will best subserve the public welfare. Stated in other

language, to hunt and kill game is a boon or privilege, granted either expressly or impliedly by the sovereign authority—not a right inherent in each individual, and consequently nothing is taken away from the individual when he is denied the privilege at stated seasons of hunting and killing game. It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the State, and hence by implication it is the duty of the legislature to enact such laws as will best preserve the subject of the trust and secure its beneficial use in the future to the people of the State. But in any view, the question of individual enjoyment is one of public policy and not of private right.' "

In *State v. Tice,* 69 Wash. 403, 125 Pac. 168, 41 L. R. A. (N. S.) 469, this court adopts the language of the supreme court of Maine in *State v. Snowman,* 94 Me. 99, 46 Atl. 815, 80 Am. St. 380, 50 L. R. A. 544, where it is said:

" 'The fish in the waters of the state, and the game in its forests, belong to the people of the state, in their sovereign capacity, who, through their representatives, the legislature, have sole control thereof, and may permit or prohibit their taking.' "

And we quoted from *Smith v. State,* 155 Ind. 611, 58 N. E. 1044, 51 L. R. A. 404, to this effect:

" 'The individual has no natural right to take game, or to acquire property in it, and all the right he possesses or can possess in this respect is granted him by the state.' "

And from *Ex parte Maier,* 103 Cal. 476, 37 Pac. 402, 42 Am. St. 129, we quoted as follows:

" 'The wild game within a state belongs to the people in their collective, sovereign capacity; it is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or any traffic or commerce in it, if deemed necessary for its protection or preservation, or the public good.' "

It is apparent, therefore, that no private right of the relator, secured to him by either the state or Federal constitutions, is taken by this act.

The writ will be denied.

ALL CONCUR.